COMMONWEALTH *vs.* WAYNE JACKSON.

No. 96-P-1691.

Suffolk. February 2, 1998. - October 27, 1998.

Present: PERRETTA, JACOBS, & LENK, JJ.

*Practice, Criminal,* Continuance without a finding, Impeachment by prior conviction. *Witness,* Impeachment, Expert. *Evidence,* Expert opinion.

Where a witness at a criminal trial had not been convicted of a crime within the meaning of G. L. c. 233, § 21, second par., within ten years of the time of his testifying, the judge erred in allowing the witness to be impeached with a record of his convictions. [668-671]

At the trial of a complaint alleging distribution of cocaine within a school zone, the opinion of the Commonwealth's expert, that drug buyers commonly refuse to identify their suppliers, should have been excluded as evidence, where such opinion was an inadmissible description of a characteristic of drug buyers or an impermissible comment on the credibility of another witness (the alleged buyer). [671]

The combined effect of errors at a criminal trial warranted the reversal of the defendant's conviction. [671-672]

COMPLAINT received and sworn to in the West Roxbury Division of the District Court Department on August 19, 1994.

The case was tried before *Robert P. Ziemian,* J.

*Josephine H. Ross* for the defendant.

*John P. Zanini,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from his convictions on a complaint charging him with distributing cocaine within a school zone, the defendant argues that the credibility of his sole witness was improperly and prejudicially undermined by impeachment with convictions inadmissible under G. L. c. 233, § 21, and profile evidence indicating that the witness was lying. We reverse the convictions.

1. *The evidence.* In the early morning hours of August 19, 1994, two Boston police officers were hiding behind bushes in

the Beechland Street housing project. Sharing binoculars, the officers saw the defendant and Victor Kipping[1] walk over to a car that had pulled up and stopped. The officers were about 250 feet from the car.

Officer Joseph Cheevers testified that he saw Kipping go to the driver's window, lean in, and appear to have a conversation. The defendant was standing about three feet behind Kipping. Cheevers stated that he saw Kipping turn to the defendant, reach out and take something from him, and then lean back into the car. After Kipping and the defendant left the area, Cheevers and his fellow officer, Jerry Barkowski, went to their car and followed and stopped the car that they had been watching. Upon looking into the car, Cheevers saw three plastic bags in a container lodged between the two front seats. Cheevers believed the substance in the bags was cocaine, and he and Barkowski quickly apprehended the defendant and Kipping.

Barkowski's testimony concerning his observations of the events did not differ in any material way from that of Cheevers. Both officers stated that they did not see drugs or money change hands between the occupants of the car and Kipping or the defendant. Nor were any drugs found on them when they were arrested.

Cheevers was allowed to testify that, in his experience, based upon over 300 drug arrests, it was very common for a drug buyer to refuse to reveal the identity of the seller because of fear of retribution.

Robert J. Leary, the driver of the car pulled over by the police, testified that he had not purchased any drugs from either the defendant or Kipping. He admitted to being a user of drugs and stated that he had met his passenger, Jeff Fox, at a bar that night and had agreed to give him a ride to West Roxbury in exchange for drugs. En route to Fox's home, Fox had him stop on Washington Street near Roslindale Square. Fox got out of the car, told Leary to wait for him, and went inside a three-family house. About five minutes later, Fox returned to the car and directed Leary to drive to the Beechland Street housing project. They drove through the project twice. On the second trip, they saw a group of men and pulled over. Fox leaned over Leary and yelled out to them from the driver's window. Kipping came over to the car, and Fox asked him if he had any drugs. Kipping

---

[1]The codefendant at trial.

said, "No," turned to the group behind him, and then told
Leary that "there was nothing going on." After Leary repeated
Kipping's statement to Fox, he started to drive back toward
Washington Street when they were pulled over by the police.

As the police walked toward the car, Leary noticed that Fox
began "squirming around," reaching into his back pocket and
down inside his pants. When the police opened the passenger
door, Fox handed them bags of cocaine.

2. *Impeachment of Leary.* After Leary's direct testimony and
over the defendant's objection, the prosecutor was allowed to
impeach his credibility with his record of convictions in 1981.[2]
As provided by G. L. c. 233, § 21, second par., those records
would be inadmissible for impeachment purposes unless Leary
had "subsequently been convicted of a crime within ten years
of the time of his testifying." The last sentence of the second
paragraph of the statute also provides that "[f]or the purpose of
this paragraph, a plea of guilty or a finding or verdict of guilty
shall constitute a conviction within the meaning of this sec-
tion."

It is the Commonwealth's position that Leary's 1981 convic-
tions were revitalized on September 16, 1994, when he ap-
peared in West Roxbury District Court on a criminal complaint
charging him with possession of a class B substance on August
19, 1994, the drug sale here in dispute. The Commonwealth
argues that Leary testified on cross-examination at the
defendant's trial that, on September 16, he pleaded guilty to the
crime set out in the complaint against him.

We do not think the Commonwealth's characterization of
Leary's testimony at the defendant's trial is entirely accurate.
The transcript shows that, in response to the prosecutor's ques-
tions, Leary stated: "I went to court. I pleaded no contest or
guilty, under the advice of counsel. Basically they're the same."
After the prosecutor objected and the trial judge made an
inaudible ruling, Leary stated, "I pleaded guilty." The trial
judge then made another inaudible statement. In any event,
Leary was then asked what happened with the case, if he knew,
and he replied that "[i]t was continued without a finding for six
months."

---

[2]The convictions were for larceny of a motor vehicle, possession of burglari-
ous tools, and malicious destruction of property. No instruction was ever
given the jury regarding the use to which they could put the evidence of
Leary's convictions.

Having offered nothing in contradiction of Leary's version of the events of September 16, the Commonwealth isolates Leary's statement, "I pleaded guilty," and argues that it disposes of the question whether the proceedings against Leary on that date resulted in a conviction within the meaning of the last sentence of G. L. c. 233, § 21, second par.[3]

As we read Leary's testimony and probation record, we conclude that the proceedings against him on September 16 were conducted in accordance with the procedures set out in G. L. c. 278, § 18, as amended by St. 1992, c. 379, § 193, which provides, in pertinent part:

> "A defendant who is before . . . a district court . . . on a criminal offense within the court's final jurisdiction shall plead not guilty or guilty, or with the consent of the court, nolo contendere. Such plea of guilty shall be submitted by the defendant and acted upon by the court; provided, however, that a defendant with whom the commonwealth cannot reach agreement for a recommended disposition shall be allowed to tender a plea of guilty together with a request for a specific disposition. Such request may include any disposition or dispositional terms within the court's jurisdiction, including, unless otherwise prohibited by law, a dispositional request that a guilty finding not be entered, but rather the case be continued without a finding to a specific date thereupon to be dismissed, such continuance conditioned upon compliance with specific terms and conditions or that the defendant be placed on probation pursuant to the provisions of [G. L. c. 276, § 87]. If such a plea, with an agreed upon recommendation or with a dispositional request by the defendant, is tendered, the court shall inform the defendant that it will not impose a disposition that exceeds the terms of the agreed upon

---

[3]The Commonwealth also claims that because the trial judge's rulings were either inaudible or not electronically recorded and because the record was not reconstructed pursuant to Mass.R.A.P. 8(b)(3)(v), as amended, 388 Mass. 1110 (1983), the defendant has waived his right of review of this issue. We do not agree. The transcript shows that the trial judge's ruling on the admissibility of Leary's 1981 convictions was based upon his reading of G. L. c. 233, § 21, second par. Moreover, Leary's probation record, which was put before this court on the Commonwealth's motion to expand the record, substantiates his testimony concerning the proceedings in the West Roxbury District Court on September 16, 1994.

recommendation or the dispositional request by the defendant, whichever is applicable, without giving the defendant the right to withdraw the plea.

"If a defendant, notwithstanding the requirements set forth hereinbefore, attempts to enter a plea or statement consisting of an admission of facts sufficient for finding of guilt, or some similar statement, such admission shall be deemed a tender of a plea of guilty for purposes of the procedures set forth in this section."[4]

These procedures allow a defendant to offer a "plea of guilty, together with a request that a guilty finding not be entered and that the case be continued without the entry of such a finding on specific terms or on probation . . . ." *Commonwealth* v. *Pyles*, 423 Mass. 717, 721 (1996). As explained in the *Pyles* case, "[s]ection 18 represents the delineation by the Legislature of a dispositional option, similar to that offered by a pretrial diversion program." *Id.* at 722. See *Commonwealth* v. *Norrell*, 423 Mass. 725, 728 (1996).

The very purpose of a pretrial diversion program is to save a deserving defendant from the "consequences of having a criminal conviction on his record." *Commonwealth* v. *Duquette*, 386 Mass. 834, 843 (1982). Pretrial diversion is, however, unavailable as a dispositional option after there has been a conviction. As discussed in analogous precedent, a conviction occurs when there has been a finding of guilty by a jury or a judge at a jury-waived trial, the entry of a formal guilty plea, or an admission to sufficient facts. See *Commonwealth* v. *Gomes*, 419 Mass. 630, 632 (1995); *Commonwealth* v. *Norrell*, 423 Mass. at 726-728.

We see no reason to give the word "conviction," as used in G. L. c. 233, § 21, second par., a meaning different from that discussed in the analogous precedents. A plea of guilty tendered pursuant to G. L. c. 278, § 18, is not the entry of a formal guilty plea and is, therefore, not a conviction. Leary's testimony and probation record show that a formal guilty plea was not entered. Instead, Leary's case was continued without a finding for six months, and he had no record of conviction at the time of his testimony at the defendant's trial. His 1981 convictions

[4]Leary's probation record indicates that on September 16, 1994, his case was continued without a finding until March 22, 1995. The defendant's trial began on May 8, 1995, and concluded on May 10, 1995.

were, therefore, stale, and it was error to allow their use for purposes of impeachment.

3. *Expert opinion.* As earlier recited, Cheevers, while relating his experience as a Boston police officer who had made over 300 drug arrests, stated that it is "very common" for a buyer to refuse to reveal the identity of the seller because of a fear of retribution. Although defense counsel earlier had objected to Cheevers being asked about his opinion as to the various methods by which drug dealers conduct their illicit business, no objection was taken to the specific question of whether it was common for buyers to identify their suppliers.

Police officers are frequently allowed "to describe the different roles played by individuals in the distribution of drugs on the streets." *Commonwealth v. Dennis,* 33 Mass. App. Ct. 666, 669 (1992), *S.C.,* 416 Mass. 1001 (1993). Cheevers's statement, however, went beyond permissible limits. "Expert testimony may not be admitted to profile or describe the typical attributes of the perpetrators of crimes." *Commonwealth v. Goetzendanner,* 42 Mass. App. Ct. 637, 644 (1997), citing *Commonwealth v. Day,* 409 Mass. 719, 724 (1991). Cheevers's statement, that drug buyers commonly refuse to identify their supplier, was an inadmissible description of a characteristic of drug buyers rather than a permissible explanation of the modus operandi employed in transacting drug sales. See *Commonwealth v. Roche,* 44 Mass. App. Ct. 372, 380 (1998). Taking Cheevers's statement as an impermissible expression of his disbelief of Leary, it is equally improper. See *Commonwealth v. Ianello,* 401 Mass. 197, 201-202 (1987); *Commonwealth v. Montanino,* 409 Mass. 500, 502-505 (1991).

4. *Effect of the errors.* It is the Commonwealth's argument that Leary's testimony was so implausible in the first instance that neither of the errors could have further damaged his credibility.[5] Although there was evidence to show that the defendant fled from the officers, gave them a false name, and had a beeper and eighty-one dollars in his possession at the time of his arrest,

[5]The Commonwealth also argues that any error in respect to the stale convictions could not have prejudiced the defendant because Leary testified only that Fox did not purchase drugs from the defendant but never mentioned whether a purchase from Kipping had occurred. The Commonwealth reads Leary's testimony too closely and overlooks the fact that Leary stated that when Fox asked Kipping whether he had any drugs, he and the defendant replied that they did not, that "there was nothing going on."

there were weaknesses in the Commonwealth's evidence as to the crime charged in the complaint, the actual sale of drugs to Leary and Fox. The officers' observations were made from their position behind bushes located 250 feet from Leary's car, and they were unable to hear any of the conversation among the men they were watching. The officers saw no drugs or money being exchanged. No drugs were found on either the defendant or Kipping when they were arrested just minutes after the arrests of Leary and Fox.

Because of the officers' inability to hear any conversation or to see an actual exchange of drugs or money, their testimony was not in conflict with that of Leary, whose credibility was crucial to the issue of whether the defendant and Kipping had sold him drugs. A substantial portion of the prosecutor's closing argument was dedicated to Leary's testimony. She prefaced her challenge of his version of events by pointing out that he was a drug user and recalling Cheevers's testimony about the reluctance of users to reveal the source of their drugs. She concluded her discussion of Leary's testimony by stating: "It is a lie. Those drugs came from these defendants."

We do not consider whether each of the errors by itself would warrant reversal of the defendant's convictions. Instead, we take them in combination (see *Commonwealth* v. *Kines*, 37 Mass. App. Ct. 540, 543-544 [1994]) and conclude that we are unable to say with fair assurance that the jury's determination to disbelieve Leary was not substantially swayed by the errors. See *Commonwealth* v. *Rosado*, 428 Mass. 76, 79-80 (1998), and cases cited.

The verdicts of guilty are vacated. The judgments of conviction are reversed.

*So ordered.*