**UNITED STATES of America, Plaintiff,**

v.

**Ruby F. BROWN, Defendant.**

No. 93–10005–03.

United States District Court,
D. Kansas.

June 1, 1995.

**1502**

Randall K. Rathbun, U.S. Atty. and Lanny D. Welch, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Jon S. Womack, Womack & Ingram, Wichita, KS, for defendant.

### MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This matter comes before the court on defendant Ruby Brown's amended motion for new trial based on newly discovered evidence, pursuant to Fed.R.Crim.P. 33. Ruby was charged, along with her common-law husband, James Brown, and their daughter, Mary Louise Brown, with five drug related crimes. At the conclusion of trial, the jury found Ruby guilty on all counts. This court then sentenced Ruby to a term of imprisonment of ten years and three months. Ruby's motion for new trial raises two issues: (1) whether evidence of the battered woman syndrome is admissible as evidence to support a defense of compulsion; and (2) whether the motion is timely with regard to the element of due diligence. On May 22, 1995, the court heard the parties' oral arguments and then adjourned to review and consider their arguments. The court is now ready to rule on defendant's motion.

Ruby was charged along with James Brown and Mary Louise Brown in a second superseding indictment with engaging in a conspiracy that ran approximately from November 11, 1991 to May 27, 1992. Specifically, Ruby was charged with one count of conspiracy to distribute cocaine base, two counts of distribution of cocaine base, and two counts of using and carrying a firearm during and in relation to a drug trafficking offense. At trial, the United States presented evidence that on November 11, 1991, Wichita Police Department (WPD) officers executed a search warrant at the Browns' residence, 1702 North Fountain, Wichita, Kansas. The officers found Ruby and Mary Louise at the residence. They also found two adult males, Ronald Christon and Tracy Mack. Christon is a brother of James Brown and Mack was identified as Mary Louise Brown's boyfriend. Ruby told the officers that James also resided there, but he was not home at the time the search warrant was executed.

In the bedroom occupied by Ruby, officers found various items containing crack cocaine or crack residue, two loaded handguns, a police scanner, a razor blade with cocaine residue, and other items commonly associated with the distribution of crack cocaine. Ruby's purse was found in that room, and in it, officers found a vial of crack cocaine and $1,500.00, including buy money from a confidential informant's purchase from the residence. The only crack cocaine discovered in the house, about 6.5 grams, was found in the bedroom that Ruby admitted was her room. Ruby was the only adult found in that room at the time of the search, and officers testi-

fied the only clothing found in the room would belong to a female.

On October 18, 1991, about three weeks prior to the search of 1702 North Fountain, WPD officers executed a search warrant at a different home in which the Browns were living. At that residence, 2211 North Minneapolis, the officers found approximately $6,000.00 in the trunk of the car being driven by Ruby. The occupants of that home were identified as James Brown, Ruby Brown, Mary Louise Brown, and two young granddaughters.

Months later, WPD officers purchased crack cocaine from the Browns while they were living in yet a third residence, 2317 Lamson. Beginning in May 1992, Johnnie Green, a narcotics detective with the WPD, began purchasing crack cocaine from all three members of the Brown family. Green first received the Brown's telephone number and their new address when he bought crack cocaine from Benny Mack, a/k/a "Fuzz," a relative of the Browns. Mack told Green to call him at the Brown's home whenever he needed crack cocaine. Green called the house at a time when he knew Mack was in jail, because Green had received information that members of the family were continuing to sell crack cocaine.

On May 11, 1992, Green called the Brown's home and spoke with a female whom he later identified as Mary Louise Brown. Mary Louise told Green that Mack was in jail but that Green could still come to the house because she had crack cocaine for sale. When Green arrived, Mary Louise took him to an address on Ellen Street where she brokered a deal with Dennis Hardwell for the purchase of 7.9 grams of crack.

On May 14, 1992, Green again called the Brown residence on Lamson Street and Mary Louise answered the phone. Green told Mary Louise that he wished to purchase cocaine. She told him to come to the house and she would sell him crack cocaine. When he arrived at the house, Green saw Ruby outside on the sidewalk and James in the garage. When James noticed Green he motioned for Green to enter the house. Once inside, Green met with Mary Louise and James in the kitchen, while Ruby remained outside. Green purchased $700.00 worth of crack cocaine, approximately 2.9 grams. Prior to leaving, Green told them he wanted to return in a week and buy $1,000.00 worth of crack. On May 22, 1992, Green called the residence and again spoke with Mary Louise. Green told her that he was in Texas but planned to come to their home on Wednesday to purchase approximately $1,000.00 worth of crack.

On May 27, 1992, Green called the residence and this time spoke with Ruby. Ruby informed Green they had crack cocaine for him. Green went to the residence and was met by Ruby. Ruby told Green to have a seat because the cocaine was being counted. Ruby came into the kitchen area where Green was seated and from an Anacin pill bottle she poured out several crack rocks. Green told Ruby that was not as much as he had requested. At that point, James entered the room and after further negotiations, James proceeded to make more crack cocaine which Green then agreed to purchase. Before leaving, Green told Ruby and James he wished to buy more crack in the future. Ruby told Green to call in advance so that the crack would be ready for him when he arrived.

As mentioned above, on November 18, 1993, Ruby was convicted on all five counts of the second superseding indictment. On March 21, 1994, Ruby moved for a new trial; she amended that motion on March 31, 1995. Ruby seeks to present evidence that she suffers from the battered woman syndrome, which she alleges will prove she lacked the requisite *mens rea* for the crimes charged. In the alternative, Ruby contends that evidence of the battered woman syndrome will support her defense of compulsion. Since her conviction, Ruby has been examined by a psychologist, Marilyn A. Hutchinson, Ph.D., and a government forensic psychologist, Andrew Simcox, Ph.D.

In her report, Dr. Hutchinson states:

7. The results of Ms. Brown's cognitive assessment indicate that she is currently functioning in the low average range of intelligence. . . . The results of her personality assessment suggest that she

possess (sic) a markedly inadequate personality. She has limited ego resources and less capacity to deal with stress than could be expected. She displays some difficulty in processing information and relies heavily on a simple and uncomplicated cognitive style. This reliance may result in Ms. Brown misinterpreting events in her surroundings and creates a likelihood that she will display behaviors that are not consistent with social demands or expectations. Ms. Brown has a narcissistic character structure and may display a tendency toward overvaluation of self-worth, masking intense feelings of insecurity and inferiority. Ms. Brown's marked sense of inferiority may cause her to withdraw from social interaction and basically, prefer to live a schizoid-type lifestyle. Ms. Brown's testing is similar to other battered women.

. . . .

11. Ms. Brown initially responded to her attorneys and during the court proceedings that she had never sold drugs. This was contrary to information provided by police undercover agents who purchased cocaine from her. When Ms. Brown was asked if she had ever handed drugs to someone and taken money from them for James Brown, she easily affirmed she had done that. Ms. Brown's concrete thinking had always led her to state she had never sold drugs because to her that involved being responsible for the sale, negotiating the price, and eventually having some money. She never had any role except as a courier. Under threat of harm, she performed that role as demanded of her by James Brown.

. . . .

14. At the time of the acts for which she has been found guilty, Ms. Brown had many depressive symptoms that would likely have warranted a diagnosis of Major Depression. Presently her testing also suggests the presence of depressive illness. Additionally, Ms. Brown's symptoms warrant a diagnosis of Schizoid Personality Disorder. Although it was difficult to detect because of her limited intelligence and lack of insight, some symptoms of Post–Traumatic Stress Disorder were noted. PTSD and depression are common in survivors of domestic violence.

15. At the time of the commission of the criminal acts of cocaine distribution, Ms. Brown was acting under the threat of physical harm from her husband, Mr. Brown. She also lacked the cognitive appreciation of her role in these acts during her initial trial to competently understand the proceedings and the questions she answered.

(Defendant's Brief in Support of Amended Motion for New Trial, Hutchinson Aff. at 2–4.)

Dr. Simcox's report states in part:

1. There is evidence to support Ms. Brown's claim of being a battered woman. Ms. Brown described a long-term pattern of being battered by James Brown. Ms. Brown's daughter, brother-in-law, and sister-in-law verified the battery. Based on such information, Ms. Brown's claim of being a "battered woman" was supported.

2. In response to the question of whether Ms. Brown was "forced to participate in the distribution of crack cocaine," Ms. Brown described feeling fearful of being struck if she did not follow her husband's directions. Ms. Brown stated she was given instructions by Mr. Brown regarding participation in drug transactions on two occasions. The first was to "hand" a bag containing illegal drugs to her brother-in-law. There was no arrest or charge related to this incident. The second occasion reportedly occurred when Ms. Brown received instructions from Mr. Brown through another person to ask "how much" when people called to inquire about drugs. Thus, Ms. Brown admitted to some minor participation in the criminal activity. She reportedly understood its legal consequences. . . . In any case, neither Ms. Brown nor any other source reported she received any direct threat relevant to her participation in the instant offense. Ms.

Brown reported she "had to" obey her husband's wishes while in the home or face physical abuse.

... In conclusion, Ms. Brown's fear of her husband may have been a contributing factor in her decision to participate in the sale of illegal substances. However, there is no evidence she was threatened with serious bodily harm or death if she did not participate in drug sales or left her home. Based on the above data, it is our professional opinion Ms. Brown was not "forced" to commit her crime.

(Federal Medical Center's Forensic Evaluation at 7–8.)

Also in support of her motion for new trial, Ruby presents deposition testimony of Mary Louise Brown. This deposition was taken without the government being present, so Mary Louise was not subjected to cross-examination. In her deposition, Mary Louise describes the abuse James directed toward Ruby as well as James' sexual abuse of Mary Louise when she was an adolescent. Mary Louise testified that Ruby is not guilty of the crimes with which she was charged. Instead, Mary Louise states, "Everything that they say that my mother did, that was Shanelle [Martin]." (Def.'s Brief in Support, Mary Louise Brown Depo. at 35.)

Shanelle Martin was one of James' girlfriends. Throughout his relationship with Ruby, James has had girlfriends and has fathered six children with those women. Shanelle came to live with the Browns when she was 14 years old. Shanelle was a runaway and Ruby took her in. At the time of the Browns' arrest, Shanelle was still living with them. In her deposition, taken June 17, 1994, Mary Louise states Shanelle is 19 years old.

■ In order to address the issues presented, it is necessary to understand the battered woman syndrome and its significance in criminal law. Most importantly, the battered woman syndrome is not a defense. Nancy Ogle, Comment, *Murder, Self-defense, and the Battered Woman Syndrome in Kansas [State v. Stewart, 243 Kan. 639, 763 P.2d 572 (1988) ]*, 28 Washburn L.J. 400, 401 (1989). It is some evidence to be considered to support a defense, such as self-defense,

duress, compulsion, and coercion. Because women who suffer from the battered woman syndrome do not act in a typical manner as compared with women who do not suffer from it, evidence of the syndrome is used to explain their behavior. Evidence of the syndrome is presented through expert testimony to assist the jury's evaluation of the defendant's state of mind. *Id.*

Derived from the study of family violence in the fields of psychology and sociology, the syndrome develops over a period of time in which the woman has been physically and psychologically abused by a man with whom she has an intimate relationship, a spouse or lover. The batterer often isolates the abused woman from her family and friends and threatens those who might offer aid and support. Repeated abuse produces a "learned helplessness" in the battered woman similar to a hostage or a prisoner of war; the woman believes her spouse or lover has control of the relationship, she has no self-worth, and she has no escape or rescue from the relationship. Leaving does not always resolve the battered woman's dilemma, because once the batterer finds her, their relationship and the abuse are worse than before her escape.

The relationship producing the battered woman syndrome may be divided into three phases. During the tension building phase, incidents of minor battering occur, and the woman eventually adopts the batterer's belief that she deserves physical, sexual, or verbal abuse. The battering escalates to the violent stage in which the batterer's abuse is uncontrolled and inflicts the greatest injury. Following a violent outbreak, the woman often reacts like a disaster victim, emotionally withdrawing for a short period of time and refusing to seek help. The quiet or loving phase follows in which the batterer becomes remorseful and promises never to mistreat the woman again, inducing the woman to continue the relationship.

*Id.* at 402–03 (footnotes omitted).

■ Federal Rule of Criminal Procedure 33 provides in pertinent part: "The court on

motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, ..." A motion for new trial "is not regarded with favor and should only be granted with great caution." *United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991).

The Tenth Circuit has repeatedly set out the standard for granting a motion for new trial. The court has stated:

"The alleged newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such that it would probably produce an acquittal; and a new trial is not warranted if the new evidence is such that, with reasonable diligence, it could have been discovered and produced at the original trial. *United States v. Allen,* 554 F.2d 398, 403 (10th Cir.) *cert. denied,* 434 U.S. 836 [98 S.Ct. 124, 54 L.Ed.2d 97] (1977).... The decision of the trial court will not be disturbed unless there has been an abuse of such discretion."

*United States v. Youngpeter,* 986 F.2d 349, 356 (10th Cir.1993) (quoting *United States v. Sutton,* 767 F.2d 726, 728 (10th Cir.1985)).

### I. *Admissibility of Evidence of the Battered Woman Syndrome*

The court must first decide whether evidence of the battered woman syndrome can be admitted. If such evidence is admissible, the court must then determine whether, with evidence of the battered woman syndrome, Ruby has met her burden of proving that a new trial is warranted. The government argues "[t]he defendant has failed to site a single federal decision finding [the battered woman syndrome] is a viable defense in federal court." (Pltf.'s Response at 5.) As stated above, the battered woman syndrome is not a defense; it is some evidence to be considered to support Ruby's current claim of compulsion. Evidence of the battered woman syndrome is presented at trial through expert testimony. *See State v.*

*Stewart,* 243 Kan. 639, 643, 763 P.2d 572 (1988) (two expert witnesses, a psychologist and a psychiatrist, testified at trial regarding the battered woman syndrome); *State v. Hodges,* 241 Kan. 183, 189, 734 P.2d 1161 (1987) (the defense and the prosecution should be allowed to introduce expert evidence of the battered woman syndrome, and it is for the jury "to determine the reliability of a particular scientific opinion"). Such evidence is used by the jury to understand the defendant's actions, and goes to her state of mind.

██ All evidence admitted at trial must be relevant. *See* Fed.R.Evid. 402. Expert testimony is allowed pursuant to Fed.R.Evid. 702 and 703. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

For decades the test used to determine whether an expert should be allowed to testify was the rule announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). There, the court states the expert's opinion must be based upon "a well-recognized scientific principle or discovery ... [that] is ... sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014. This "general acceptance" test, however, has been superseded by adoption of the Federal Rules of Evidence.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court stated the rigid "general acceptance" requirement of *Frye* is too limiting. Instead, the courts

should interpret the Federal Rules of Evidence just as they would any other statute. 509 U.S. at ——, 113 S.Ct. at 2793–94, 125 L.Ed.2d at 479. The Court noted that Fed. R.Evid. 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

The standard for relevance is a liberal one. Defined in Rule 401, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In *Daubert,* the Court explained:

[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

... Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability.

... Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

509 U.S. at ——, 113 S.Ct. at 2795–96, 125 L.Ed.2d at 480–82.

■ The Court offered the following as guidance for determining admissibility of expert testimony:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.

509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. Some factors to be considered are: (1) whether a scientific theory or technique can be and has been tested; (2)

whether the theory or technique has been subjected to peer review and publication; (3) in the case of particular scientific technique, consideration should be given to the known or potential rate of error; and (4) what the degree of acceptance is within the relevant scientific community (i.e., the *Frye* test). The Court noted that a Rule 702 inquiry should be a flexible one and that the focus must be "on principles of methodology, not on the conclusions that they generate." 509 U.S. at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 484.

Because the admissibility of expert testimony is more liberal under the Federal Rules of Evidence than under *Frye,* the Court explained the adversary system should provide the balance needed. It stated:

Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, Fed.R.Civ.P. 56. These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standard of Rule 702.

509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 484–85 (citations omitted).

Prior to *Daubert,* but after the adoption of the Federal Rules of Evidence, the Tenth Circuit acknowledged the Rules' liberal admissibility standards concerning expert testimony. In *Head v. Lithonia Corp., Inc.,* 881 F.2d 941, 944 (10th Cir.1989), the court stated:

Under Fed.R.Evid. 703 experts are given wide latitude to testify on facts otherwise not admissible in evidence and "to broaden the acceptable bases of expert opinion." *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977). Implicit in the rule, however, is the court's

guidance to "make a preliminary determination pursuant to Rule 104(a) whether the particular underlying data is of a kind that is reasonably relied upon by experts in a particular field in reaching conclusions." 3 J. Weinstein & M. Burger, *Weinstein's Evidence* ¶ 703[03], at 703–16 (1982). This determination must be made on "a case-by-case basis and should focus on the reliability of the opinion and its foundation rather than merely on the fact that it was based, technically speaking, upon hearsay." *Soden* [*v. Freightliner Corp.*, 714 F.2d 498, 503 (5th Cir.1983) ] (citation omitted). Thus, the district court "may not abdicate its independent responsibilities to decide if the bases meet minimum standards of reliability as a condition of admissibility." *In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1223, 1245, [ (E.D.N.Y.1985) ], *aff'd*, 818 F.2d 187 (2nd Cir.1987)[, *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988) ].

■ In the case before this court, Ruby's state of mind is clearly relevant to the crimes charged. Expert testimony would assist the jury in determining Ruby's state of mind and whether she acted as she did because James threatened or abused her. At this point in the proceedings, the proffered expert testimony of Drs. Hutchinson and Simcox appears to meet the requirements of admissibility as set out in the Federal Rules of Evidence and *Daubert.* Accordingly, such evidence should be admissible if a new trial is granted.

## II. *Is Defendant's Motion For New Trial Timely?*

A review of Tenth Circuit cases does not reveal a bright-line rule of what constitutes reasonable due diligence in discovering evidence. Common sense and case law points to a requirement that the evidence could not be discovered easily prior to trial. For example, in *United States v. Palmer*, 766 F.2d 1441 (10th Cir.1985), defendant moved for a new trial based on newly discovered evidence. The "new evidence" offered consisted of an accounting document and affidavits. The court affirmed the district court's decision that defendant failed to carry his burden

of proving a new trial was warranted. The court stated: "Appellant had access to the affiants before trial. Upon the exercise of due diligence, he could have obtained the evidence in question." 766 F.2d at 1446.

In *United States v. Allen*, 554 F.2d 398 (10th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977), the defendant moved for a new trial and argued that "his trial counsel's failure to investigate, prepare and assert insanity as a defense demonstrates such a deprivation of his Sixth Amendment right to effective assistance of counsel as to require reversal." 554 F.2d at 401. Defendant's motion for new trial alleged the following facts:

Allen was suffering from a severe mental illness during the time of the offenses and was not responsible for his actions; specific intent is an essential element of the crimes and defendant was incapable of recognizing the importance of information concerning his mental illness and presenting it to the court. On the date of first sentencing, one of defendant's retained trial counsel stated that he had not been aware of the seriousness of defendant's mental illness until a post-trial report from Dr. Winston L. Martin was received by the probation officer, and that if he had known of this information, he would have tried the case on an entirely different basis. The motion for a new trial, filed by other counsel employed by defendant, stated (R.I., 138):

"5. Defendant's incapacity and ignorance resulting from his mental illness, place such information in the capacity of newly discovered evidence; or alternatively, newly discovered evidence resulting from ineffective counsel, so as to deprive the Defendant of his 6th Amendment constitutional rights to competent counsel in a fair and just trial."

In further support of the motion, new counsel, Mr. Higginbotham, submitted his affidavit. It said that defendant Allen had stated he was not aware of the importance of the information for purposes of trial until so advised by Mr. Higginbotham.

554 F.2d at 401–02.

The trial court held that even if other requirements were met, "a new trial should

not be granted 'because the evidence should have been discovered prior to trial through the exercise of due diligence by Mr. Allen or his attorneys.'" 554 F.2d at 403. The district court stated that "'[e]ven assuming it is in the nature of Allen's illness to conceal its nature and severity, there is no contention that his attorneys or Dr. Martin labored under the same handicap.'" 554 F.2d at 403. The Tenth Circuit affirmed the trial court and noted that defendant's mental condition had been raised prior to trial, in support of a motion for continuance. Furthermore, defendant's mental condition was presented at trial in that defendant was asked by his attorney about his hospitalization and electroshock treatments.

■ In the case currently before the court, the order for final judgment was entered on March 30, 1994. Ruby moved for new trial on March 21, 1994, and therefore there is no question that her motion was filed "before or within two years after final judgment." Fed.R.Crim.P. 33. Accordingly, the issue presented turns on whether evidence of the fact that Ruby is a battered person could have been discovered through due diligence prior to trial. Defense counsel contends it could not have been discovered until after the verdict in this case.

For support, defense counsel points to Dr. Hutchinson's report which indicates defense counsel's lack of knowledge with regard to this syndrome is not unusual. The defense notes "Dr. Hutchinson concludes that she believes that Ruby Brown never had any role except as a courier and that she preformed [sic] that role as demanded of her by James Brown under threat of harm. Therefore, defense counsel maintains that Ms. Brown, because of her mental condition, did not and could not reveal her involvement to defense counsel and did not do so for some time after trial. It is also significant that Dr. Hutchinson concludes in paragraph number 15 that Ruby Brown lacked '... the cognitive appreciation of her role in these acts during her initial trial to competently understand the proceedings and the questions she answered.'" (Def.'s Brief in Support at 2–3.)

Defense counsel argues that a woman suffering from the battered woman syndrome is not likely to come forward voluntarily with information regarding the abuse she has received. Defense counsel explains that Shanelle Martin accompanied Ruby to her appointments with him, and that Shanelle sat in on those meetings. Accordingly, Ruby waived her attorney-client privilege. Defense counsel maintains that Ruby, at her meetings with him prior to trial, did not feel free, in the presence of James' live-in girlfriend, to discuss the abusive relationship that existed between Ruby and James. Defense counsel further points out that the government had been conducting an investigation of the Browns and their drug trafficking for a long period of time, and had never discovered the fact that James abused Ruby. That being so, defense counsel contends it is not surprising that he was not able to discover it prior to trial.

Another reason for defense counsel's inability to discover that Ruby suffers from the battered woman syndrome and was being forced by James to participate in drug sales is that counsel was unable to interview James or Mary Louise. As co-defendants, they were represented by other counsel and Ruby's attorney was not allowed to speak with them.

Defense counsel also argues that the introduction of evidence that Ruby suffers from the battered woman syndrome, in support of a defense of compulsion, would likely lead to a verdict of not guilty. Mary Louise's deposition reveals that Ruby and Mary Louise protected each other. Ruby tried to protect her daughter from further abuse by staying in the family and doing what James told her to do. Thus, defense counsel contends that Ruby can satisfy the elements of the compulsion defense, which K.S.A. § 21–3209 (1988) defines as:

(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believed that death or great bodily harm will be inflicted upon him or his spouse, parent, child, brother or sister if he does not perform such conduct.

In response, the government argues evidence that Ruby is a victim of abuse is not newly discovered evidence. Information within the defendant's knowledge at the time of trial does not constitute newly discovered evidence. *United States v. Muldrow*, 19 F.3d 1332, 1339 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994). In *Muldrow*, the court stated, "If a former codefendant who originally chose not to testify subsequently comes forward and offers testimony exculpating a defendant, the evidence is not newly discovered if the defendant was aware of the proposed testimony prior to trial." *Id.; see also United States v. Cotner*, 657 F.2d 1171, 1173 (10th Cir.1981).

The facts presented here can be distinguished from *Allen*. Ruby's mental state was not raised at trial. According to Dr. Hutchinson's report, it is the nature of Ruby's illness to conceal its existence. Unlike *Allen*, there are no hospital records or other readily accessible evidence that would indicate to Ruby's attorney that she suffered from the battered woman syndrome. Ruby never told her attorney that she was abused by James; this is in accord with symptoms of the syndrome. In fact, it was not until Ruby's relatives contacted her attorney, post-trial, that he learned of the abuse and thereby had any reason to suspect evidence of the battered woman syndrome could aid in her defense. Accordingly, the court finds the defense has satisfied the due diligence requirement for granting a new trial.

█ Evidence that Ruby suffers from the battered woman syndrome is "more than impeaching or cumulative." It is new evidence that helps explain Ruby's acts and state of mind, and furthermore, it supports her defense of compulsion. The court finds such evidence will probably produce an acquittal.

IT IS ACCORDINGLY ORDERED this 1st day of June, 1995, that defendant's amended motion for a new trial (Dkt. No. 173) is granted.