## COMMONWEALTH *vs.* JULIE A. PIKE.

Franklin. February 10, 2000.˙- April 13, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Homicide. Joint Enterprise. Practice, Criminal,* Capital case, Instructions to jury, New trial. *Evidence,* Joint enterprise. *Felony-Murder Rule. Malice. Battered Woman Syndrome.*

At the trial of a murder indictment, the evidence warranted the finding that the victim's death was proximately caused by the defendant's acts during the commission of underlying felonies, and the judge's instructions on proximate cause were proper and sufficient. [215-216]

The evidence at a murder trial supported findings that the defendant committed the felonies of breaking and entering in the daytime with intent to commit a felony and larceny of a motor vehicle with conscious disregard of the risk to the victim's life, and that the felonies were independent of the murder; the felony-murder rule was applicable in the circumstances. [216]

At a murder trial, the judge's instructions to the jury on malice were correct in all respects, and any language similar to disapproved "frame of mind" language could not have affected the jury's determination. [216]

Discussion of battered woman syndrome and cases in which evidence of such a syndrome was in issue. [221-222]

There was no basis in the record to conclude that a judge was plainly wrong in disbelieving a criminal defendant's testimony at a hearing on a motion for new trial to the effect that the defendant had suffered from battered woman syndrome at the time of the crime, and in concluding that, if the defendant had been abused, such evidence was available at the time of her trial and was not newly discovered. [216-218, 222-226]

In a proceeding on a criminal defendant's motion for a new trial, the judge did not err in denying the defendant's motions for reconsideration of the denial of new trial and to expand the record. [226-227]

INDICTMENT found and returned in the Superior Court Department on November 1, 1994.

The case was tried before *John F. Murphy, Jr.,* J., and a motion for a new trial, filed on April 28, 1997, was heard by *Bertha D. Josephson,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*James L. Sultan* (*Catherine J. Hinton* with him) for the defendant.

*Judith Ellen Pietras*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. The defendant, Julie A. Pike, was charged with murder in the first degree. A jury in the Superior Court considered that charge and convicted her of murder in the second degree.[1] The defendant's boy friend, Barry Loring, had also been indicted for murder in the first degree. He testified against her at her trial under an agreement with the Commonwealth that allowed him to enter a plea of guilty to murder in the second degree. Represented by new counsel on appeal, the defendant argues that the trial judge erred in (1) submitting the case to the jury on the theory of joint venture; and (2) instructing the jury on the elements of second degree felony-murder and on malice. The defendant also argues that the judge who decided her motion for a new trial[2] improperly denied the motion. We granted the defendant's application for direct appellate review. We discern no error in any of the matters raised by the defendant. Accordingly, we affirm the defendant's conviction and the denial of her motion for a new trial.

Based on the evidence most favorable to the Commonwealth, and the reasonable inferences that could be drawn therefrom, the jury could have found the following facts. On September 23, 1994, the defendant and Loring broke into the Greenfield home of Don W. Maynard (Maynard), having formed a plan to wait until Maynard returned home, kill him, and steal his automobile. While waiting inside Maynard's house, the defendant and Loring changed into Maynard's clothes, used the clothes dryer in the basement to dry their own wet clothes and sneakers, made sandwiches, and ate them sitting on the kitchen floor. Having discovered two firearms on a rack in the dining room, the defendant and Loring searched the house for ammunition, which they found in a bedroom closet. Loring then loaded one firearm, a .22 caliber rifle, while the defendant lay

---

[1] In their verdict form, the jury found that the defendant was guilty of murder in the second degree on two grounds: (1) that the murder had been committed with malice aforethought, but without deliberate premeditation; and (2) that the murder had been committed in the course of the commission or attempted commission of felonies that were not punishable by life imprisonment, specifically, the crimes of breaking and entering in the daytime with intent to commit a felony and stealing a motor vehicle.

[2] The Superior Court judge who presided at the trial had retired at the time the motion for a new trial was scheduled for hearing, and the motion was decided by another judge in the Superior Court.

on Maynard's bed. The two planned that, on Maynard's return, Loring would use this rifle to kill him. When Maynard returned home a short time after noon, however, Loring was downstairs, checking their sneakers that were still in the dryer, and the rifle was in the bedroom with the defendant. Maynard entered the kitchen and was aware that someone was in the house. Loring, coming up the basement stairs, grabbed Maynard by the left arm and swung him around. At the same time, the defendant, whom Loring had not seen enter the kitchen, killed Maynard with a shot to the back of his head, fired at close range.

Together, the defendant and Loring cleaned away Maynard's blood from the scene. After removing Maynard's wallet from his pants pocket, they wrapped his body in plastic and in a green bedspread, fitted it into a plastic trash barrel, and loaded the barrel into the trunk of Maynard's automobile. They then filled trash bags with cleaning supplies and towels they had used to clean, and loaded these trash bags, with a mop and a bucket, into the vehicle's trunk. At one point, the telephone rang. The defendant answered it and convincingly told the caller that Maynard was away on a personal emergency. After taking other items, a guitar and two cameras, from the house, the defendant and Loring drove Maynard's automobile to a wooded area in Vermont, where they threw the items from the trunk, including Maynard's body, into a ravine.

The two drove to a laundromat to wash their clothes, where the defendant, who was seven months' pregnant at the time, chatted with two people about the baby. They then drove to a motel in Brattleboro, Vermont, where they spent the night, before driving to Keene, New Hampshire, the following morning. There, the defendant entered a pawn shop, where she sold the guitar and one camera, and a camera store, where she sold the other camera stolen from Maynard's home. Because they needed more money, the defendant made a telephone call to a friend, who wired her $200. The defendant and Loring then took a bus to Boston, where they used Maynard's credit card to purchase airline tickets to Los Angeles. The two were arrested several weeks later, in Los Angeles, where they were living in an empty movie theater.

1. The defendant admits that Loring's testimony that she shot and killed the victim warranted submission of the case to the jury on the basis that she could be convicted as a principal. She maintains, however, that there was no evidence presented by the

Commonwealth tending to prove that Loring was the shooter. As a result, she argues that she could have been convicted as a joint venturer only by speculation on the part of the jury that Loring had shot the victim while she stood by ready to assist him or actually assisting him. Thus, she concludes that, in the absence of sufficient evidence of joint venture, the jury should not have been allowed to consider that theory, and, because the jury did not differentiate in their verdict form between principal and joint venture liability, she is entitled to a new trial. See *Commonwealth* v. *Green,* 420 Mass. 771, 781 (1995) (if jury may have relied on theory of liability inadequately supported by evidence, defendant entitled to new trial). We reject the argument.

The evidence most favorable to the Commonwealth supported a finding by the jury beyond a reasonable doubt that the defendant and Loring were involved in a joint venture during which the victim was killed. It was beyond dispute that either the defendant or Loring, while participating in the joint venture, fired the fatal shot. Direct evidence was not necessary to show that Loring may have been the shooter. See *Commonwealth* v. *Chipman,* 418 Mass. 262, 268 (1994), and cases cited. The evidence was such that the jury could have inferred that Loring "lied to protect himself in testifying that [the defendant shot the victim] and then reasonably believed his other testimony." *Commonwealth* v. *Daughtry,* 417 Mass. 136, 140 n.1 (1994). See *Commonwealth* v. *DeCicco,* 44 Mass. App. Ct. 111, 116 (1998). That being the case, it was "needless[] to decide who was a principal and who a helper — for each [could on the evidence be found by the jury] guilty whether acting in one or the other role or successively in both." *Commonwealth* v. *Sanchez,* 40 Mass. App. Ct. 411, 419 (1996). See *Commonwealth* v. *Frias,* 47 Mass. App. Ct. 293, 298 (1999), and cases cited. The judge properly submitted the case to the jury for them to consider whether the defendant was guilty of murder as a joint venturer, a ruling apparently acknowledged as correct at the time by the defendant's experienced trial counsel when no specific argument was made on the insufficiency of the Commonwealth's evidence as to the defendant's possible liability as a participant in a joint criminal enterprise.

2. The defendant's arguments concerning the jury instructions lack merit.

(a) The judge's failure to instruct the jury, in connection with

the felony-murder theory, that the killing must be found to be a natural and probable consequence of the defendant's acts, was inconsequential. No objection was made by the defendant's trial counsel. The instruction is unnecessary unless the evidence raises an issue requiring an explanation of the point. See Model Jury Instructions on Homicide of the Supreme Judicial Court 67-68 n.8 (1999). The evidence warranted the finding that the victim's death was proximately caused by the defendant's acts during the commission of the predicate felonies, and the jury were properly instructed that, before they could convict of murder, they must conclude that "the action of [the defendant] was the proximate cause of [the victim's] death . . . a cause which, in natural continuous sequence, produces a death, and without which the death would not have occurred." No more was necessary.

We also reject the defendant's somewhat perfunctory argument that the felony-murder rule is inapplicable to the underlying predicate felonies in this case (breaking and entering in the daytime with intent to commit a felony and larceny of a motor vehicle). The jury were warranted in finding that both felonies were committed with a conscious disregard of the risk to human life and were independent of the murder. We reject the suggestion that a second degree felony-murder conviction cannot be based on property crimes such as those committed here, so long as the evidence supports a finding that the crimes were committed with a conscious disregard of the risk to the victim's life. See *Commonwealth* v. *Chase*, 42 Mass. App. Ct. 749, 751-753 (1997).

(b) In his malice instruction, the judge used language similar to the "frame of mind" language that was disapproved in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). No objection was made by the defendant's trial counsel. The instructions on malice correctly defined all three prongs of malice and were correct in all other respects. The nature of the killing, a shot from a .22 caliber rifle fired at contact, or near contact, with the back of the victim's head, displayed malice in the plainest sense. The "frame of mind" language could not have affected the jury's determination of malice.

3. We now come to the principal issue which concerns the defendant's motion for a new trial. The defendant maintained at trial that she was not inside Maynard's home at the time when he was killed. She testified that, following Loring's instructions,

she had waited at a bridge until he returned, and only then did she enter the house, to find that Maynard had been shot and killed. According to the defendant, her participation in the killing was limited to assisting Loring, at his request, to clean up Maynard's blood and dispose of his body. Further, she denied the existence of any plan that the defendant and Loring would break into Maynard's home, kill him, and steal his automobile. The jury rejected this testimony.[3]

The defendant filed a motion for a new trial, claiming that she suffered from battered woman syndrome on the day of Maynard's killing, and, had the jury heard evidence of this claim, there is a substantial likelihood that she would have been acquitted, because the evidence would have (1) negated an inference of consciousness of guilt; (2) provided an alternative defense that, whatever actions the defendant took on the day of the killing, she took under Loring's duress; and (3) significantly undercut Loring's testimony that the defendant was a willing participant in the killing and its aftermath. The defendant further claimed that the evidence that she suffered from battered woman syndrome was "newly discovered" as matter of law, because the effects of the syndrome prevented her from disclosing the evidence to her trial counsel.

The judge held an evidentiary hearing on the motion, at which the defendant testified for the first time that she was verbally, physically, psychologically, and sexually abused by Loring before the murder and their subsequent arrest, and that the abuse continued after they were incarcerated in the same house of correction. At the hearing, in addition to testimony of Loring's abuse, which we shall describe shortly, the defendant related a new version of the events of the afternoon of Maynard's death, admitting that she had been inside Maynard's home before the shooting, but still maintaining, as she did at trial, that she did not commit the killing and was not present in

---

[3]The jury may have reached their verdict based on a disbelief of the defendant's account of the crime, including her denial that she was in the house prior to the killing and ate or drank anything from the kitchen of Maynard's house (which was directly contradicted by the Commonwealth's evidence that the defendant's fingerprints were found on a plastic cup in the kitchen). Aware that Loring had agreed to enter a guilty plea to murder in the second degree, the jury may then have convicted the defendant of murder in the second degree, rather than murder in the first degree, concluding that the defendant and Loring had acted together and so should be found guilty on an equal basis.

the house when the killing took place. The judge made findings of fact and rulings of law and denied the defendant's motion. The defendant then moved for reconsideration of her motion for a new trial and to expand the record. The judge reconsidered the matter and reaffirmed her denial of the motion.

We briefly summarize the legal standards for granting a new trial based on a claim of newly discovered evidence. "A judge 'may grant a new trial at any time if it appears that justice may not have been done.' " *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986), quoting Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). A defendant seeking a new trial on the basis of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. See *id.* See also *Commonwealth* v. *Ortiz*, 393 Mass. 523, 537-538 (1984). The allegedly new evidence must be material and credible, see *Commonwealth* v. *Brown*, 378 Mass. 165, 171-172 (1979), and "carry a measure of strength in support of the defendant's position." *Commonwealth* v. *Grace*, *supra*. A defendant must also show that the evidence was unknown to the defendant or the defendant's counsel, and not discoverable through "reasonable pretrial diligence" at the time of trial or at the time of the presentation of any earlier motion for a new trial. See *id.* at 306; *Commonwealth* v. *Brown*, *supra*.

We next state, in some detail, the defendant's account of her alleged abuse and other matters, and summarize the testimony of her expert witnesses. The defendant testified that, although Loring was kind when they first met, his abusive behavior began in March, 1994, within six weeks of the start of their relationship.[4] The defendant stated that she was afraid, but did not know how to escape from Loring's control. Attempts to enlist aid from others were unsuccessful, she said, because Loring

---

[4]The defendant testified that Loring did the following: (1) regularly slapped, pinched, and bit her; (2) threatened to kill her, her family, and friends if she left him; (3) forced her into prostitution; (4) controlled when she ate, slept, went to the bathroom, and showered; (5) forced her to shower in extremely cold and extremely hot water; (6) made her eat off the floor; (7) urinated and defecated on her; (8) committed sodomy on her as punishment for not bringing home enough money; (9) threatened her pregnancy by dragging a knife across her stomach, stating he would cut out the baby, and throwing matches at her, stating he would light her pubic hair on fire; and (10) threatened to kill the baby when it was born.

would find out and subject her to more punishment.[5] The defendant testified that, in June, 1994, she stopped trying to get help and began focusing on staying alive and keeping her unborn child safe. The defendant acknowledged that occasionally Loring treated her nicely by apologizing for past abuse, buying her presents, and saying that he loved her. The defendant further maintained that, at the time she and Loring arrived in Greenfield, she believed that things would improve after the child was born.

On their arrival in Greenfield, the defendant said that she and Loring lived in the woods for several days. The defendant testified that Loring took away her shoes and socks at night; used her shoelaces to tie her wrist to his to prevent her escape; and, during the day, repeatedly left her tied to a tree. The defendant claimed that her encounters with people in the neighborhood to request food were orchestrated by Loring, who threatened to kill her if she did not do as he instructed. The defendant described being cold, wet, and frightened. The defendant testified that, on the morning of the shooting, Loring tied her to a tree, asking her, when he returned, "Don't you think this is a good day to die?" The defendant admitted that she was inside the Maynard house before the killing, but testified that she fled into the woods in fright when Maynard arrived unexpectedly, and returned to the house only after the shooting, when Loring came out with a rifle in his hand and ordered her inside.

The defendant testified that she helped Loring clean up Maynard's blood and load his body, and other items from the house, into the trunk of Maynard's automobile, because Loring had a gun and she was afraid he was going to kill her. The defendant stated that she spoke with others at the laundromat because Loring ordered her to smile and act normally. Her testimony was essentially that, everything she did in the aftermath of the killing, she did out of fear of Loring. She indicated that, after she was arrested in Los Angeles, she did not tell the police that Loring had abused her because they were men and she was "too shy to talk about it."

---

[5]The defendant described a time when, after discovering that she had confided to a friend about an abusive boy friend, Loring held her over the side of a porch while threatening to push her over the twelve- or fifteen-foot drop. The defendant also testified that she tried to save money to escape, but Loring found it, and that she once wrote a note stating that she was afraid, but Loring discovered the note before she could pass it on.

While awaiting trial, the defendant and Loring were both housed at the Franklin 'County house of correction. There, the defendant claimed that the physical setup of the building, the proximity of their respective cells, and the cooperation of certain correction officers allowed Loring to continue to assert control over her.[6] As a result, the defendant testified, being in jail did not make her feel safe from Loring. She stated that Loring told her how to testify at her trial, and convinced her that he knew the system well enough to get her out, so she did not tell anyone that Loring had abused her.[7]

Additionally, the defendant presented the testimony of two expert witnesses, a prison social worker, Christie Dustman, and a forensic psychiatrist, Dr. Prudence Baxter.[8] Both witnesses ac-

[6]During the first week of the defendant's arrival at the jail, her cell was located directly beneath Loring's. The defendant testified that he communicated with her by dropping notes through cracks in the floor. When the defendant moved to a new cell, the defendant stated that Loring and she spoke through pipes in the wall several times a day. The defendant added that they also communicated by sending notes in boxes of crackers bought at the canteen, which were delivered by various correction officers. In addition, the defendant testified that Loring watched her going to the library, and having visits with her family and her counsel, and that he monitored her relationships with other inmates and correction officers. The defendant described how Loring would ejaculate into rubber gloves, which he would then send to her in cracker boxes. The defendant testified that Loring told her that he would kill their son who had been born in November, 1994, if she told of the abuse he had inflicted on her. Specifically, the defendant stated that Loring told her that accidents happen and that he might have an accident on his next visit with their child.

[7]Although the defendant admitted that, prior to trial, she once asked her trial counsel whether evidence that she was abused would make a difference in her case, she does not claim that her trial counsel was incompetent in failing to recognize characteristics of battered woman syndrome in her behavior while preparing for trial, or in failing to question the defendant's friends and family on the nature of the defendant and Loring's relationship. The defendant's lead trial counsel served as defense counsel at the trial in *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 640 (1997) (expert testimony on battered woman syndrome admissible to explain victim's vacillating behavior toward defendant), and so would undoubtedly have been familiar with the legal significance of battered woman syndrome evidence to the defendant's case.

[8]With her motion for a new trial, the defendant submitted affidavits, eight of which, she states, corroborate her account of Loring's abuse. The defendant, for reasons not shown in the record, did not choose to call any of these affiants to testify on her behalf at the evidentiary hearing, at which the defendant bore the burden of coming forward with admissible evidence, subject to cross-

cepted the defendant's descriptions of Loring's abuse as truthful in formulating their opinions. Dustman offered her opinion that the defendant, who first alluded to an abusive relationship during therapy between November, 1995, and June, 1996, but did not disclose details of the abuse until pursuing her motion for a new trial, may not have come forward earlier out of fear or because the abuse had been so terrible that she tried to put it out of her mind. Dr. Baxter described behavioral characteristics common to battered women, and she opined that the defendant shared many of these characteristics, including an inability to take autonomous action on her own behalf. Dr. Baxter concluded that it was not until the defendant was physically removed from Loring for some period of time, had a female lawyer, and understood that her child was safe from Loring, that she was able to come forward with evidence of the abuse.

We come now to the specific considerations that resolve this appeal. Battered woman syndrome has been described as a " 'series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.' *State* v. *Kelly*, 97 N.J. 178, 198 (1984). 'Among the characteristics of such abused women are a decrease in self-esteem, an emotional dependence upon the dominant male and [a] type of psychological "learned" helplessness arising out of an inability to predict or control the violence directed against them. Numbed by a dread of imminent aggression, these women are unable to think clearly about the means of escape from this abusive family existence; and this emotional paralysis is often reinforced by their traditional beliefs about the sanctity of home and family and their false hopes that things will improve.' *People* v. *Torres*, 128 Misc. 2d 129, 132 (N.Y. Sup. Ct. 1985)." *Commonwealth* v. *Moore*, 25 Mass. App. Ct. 63, 66 (1987). The reliability of expert testimony concerning battered woman syndrome has gained acceptance[9] and, when properly presented, is considered admissible to show self-defense, see *Commonwealth* v. *Ro-*

---

examination by the Commonwealth, that met the standards for a new trial. See *Commonwealth* v. *Figueroa*, 422 Mass. 72, 79 (1996). Accordingly, the judge could have, but was not required to, consider these affidavits. See *Commonwealth* v. *Grace*, 397 Mass. 303, 312-313 (1986).

[9]The Legislature has concluded that battered woman syndrome may be the subject of expert testimony at the trial of criminal cases "charging the use of force against another where the issue of defense of self or another, defense of duress or coercion, or accidental harm is asserted." G. L. c. 233, § 23F, as ap-

*driquez*, 418 Mass. 1, 7 (1994), to explain a victim's erratic behavior, see *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 640 (1997), and to prove that a defendant's statements to police were not voluntary, see *Commonwealth* v. *Crawford*, 429 Mass. 60, 66-68 (1999). See also *Commonwealth* v. *Lazarovich*, 410 Mass. 466, 475-476 (1991) (assuming battered woman syndrome evidence may be admissible to prove lack of criminal specific intent). We also accept that, in appropriate cases, evidence of battered woman syndrome may constitute "newly discovered" evidence, even though the condition may have existed prior to, or at the time of, trial. See *United States* v. *Brown*, 891 F. Supp. 1501 (D. Kan. 1995); *McMaugh* v. *State*, 612 A.2d 725 (R.I. 1992). We do so because our case law, as well as experts in the field, acknowledge that a common characteristic of battered women is a "learned helplessness," which manifests itself in an inability of the woman to perceive herself as abused, or to gain help by communicating the abuse to others. See *Commonwealth* v. *Moore, supra*; Gender Bias Study of the Supreme Judicial Court 83 (1989) (battered women "tend to minimize and deny the severity and extent of the abuse"). See also *Commonwealth* v. *Crawford, supra* at 66-67 (equating battered woman syndrome with posttraumatic stress disorder). It would contravene the purpose of Mass. R. Crim. P. 30 (b), which permits a new trial "at any time if it appears that justice may not have been done," to deny a defendant the opportunity to present evidence that she is, or was, subject to battered woman syndrome, on the ground that the evidence is not "newly discovered," when the failure to recognize (or be able to communicate to one's attorney or others) that she is a battered woman is itself a specific characteristic of the syndrome. As long as the evidence that a defendant suffers from battered woman syndrome is material and credible and is not cumulative, the fact that a defendant may have had some knowledge of abuse at the time of trial would not necessarily bar favorable action on a motion for a new trial. See *Commonwealth* v. *Grace, supra* at 305.

For purposes of this opinion, we also assume, without deciding, that battered woman syndrome evidence would have been admissible at a new trial, even though the defendant denied responsibility for the killing, for purposes of showing that the

pearing in St. 1996, c. 450, § 248, which replaced G. L. c. 233, § 23E, inserted by St. 1993, c. 477, § 1 (in effect at time of the killing).

defendant's admitted participation in events before and after the killing was induced by a well-founded fear of death or of serious bodily injury, see *Commonwealth* v. *Robinson*, 382 Mass. 189, 199 (1981), as well as to negate an inference of consciousness of guilt and to undercut Loring's testimony that she was a willing participant. We assume as well that such evidence would have been admissible, as the defendant argues on appeal, to establish that the defendant lacked the requisite specific intent necessary to convict her of murder or the underlying felonies for felony-murder. See *Commonwealth* v. *Lazarovich, supra.* We reject the Commonwealth's suggestion that use of expert testimony of battered woman syndrome is limited to instances where a defendant uses force against her batterer, or that such testimony is limited to general characteristics of the syndrome. See G. L. c. 233, § 23E (in effect at time of the killing).

We turn now to the defendant's motion. The defendant's contentions fail at their core, because the judge who heard the motion (who had also informed herself of matters at trial by reading the trial transcript) concluded, in unequivocal terms, that the defendant's claim, that she suffered from battered woman syndrome, was false. In her memorandum of decision, the judge made the following findings and conclusions: "[The defendant's] claim that she endured horrific acts of abuse and · was unable to disclose any evidence of the abuse at the time of her trial is not credible. While it is likely that she was subjected to some of the described acts, at least up to the point of her incarceration, it does not follow that [the defendant] meekly surrendered to Loring's inescapable control at the time of her trial. Her claim that even while incarcerated and physically separated from Loring, she continued [to] fear him so much that she could not reveal any evidence of abuse to anyone, including her own defense counsel, is specious. . . . [The defendant's] past deceptions also undermine her credibility. [The defendant], an admitted liar, approached [people] in the Greenfield area and convincingly implored them for assistance by maintaining that she was running from an abusive boyfriend and needed help. In those instances, [the defendant's] motives were not genuine but contrived to exploit and manipulate people for her own gain. . . . [The defendant's acts and her] own admission that she gave perjured testimony at trial highlight her aptitude for lying and cast real doubt on the sincerity of her testimony and claim that she could not disclose any evidence of abuse at trial."

The judge also found that the defendant's claim that her trial testimony was choreographed entirely by Loring "strains the bounds of credibility." The judge concluded that, "[t]he evidence is that if [the defendant] was abused by Loring, she knew it and had the capacity to raise the issue in her defense at trial. . . . Therefore, because any evidence of abuse was known and available to [the defendant] at the time of her trial, it is not newly discovered." According to the judge, "the facts in this case do not support [the defendant's] claim that she suffered from [battered woman syndrome]."[10]

The defendant suggests that the judge applied an impermissibly stringent standard in determining that the evidence that she had been abused but failed to disclose the abuse due to the effects of battered woman syndrome, was not newly discovered, by erroneously requiring her to show that she was incapable of disclosing the abuse, rather than allowing her to show merely that her failure to disclose the abuse was not a voluntary act. We need not consider the defendant's argument, however, because, as has been discussed above, the judge simply did not believe that the defendant suffered from battered woman syndrome.[11] It is uncommon for a judge to condemn a defendant's testimony in such harsh and specific language, especially in light of the story of abuse the defendant recounts, which, if it

---

[10]The judge explicitly rejected Dr. Baxter's testimony that the defendant suffered from battered woman syndrome at the time of her trial. While noting that Dr. Baxter is a highly respected and qualified psychiatrist, the judge reasonably found that the doctor's opinion was dependent on the accuracy and reliability of facts presented to her by the defendant. The judge stated: "As [the defendant's] version of the facts is unreliable, [the expert's] opinion that she suffered from battered woman[] syndrome or was still subject to Loring's pervasive control at the time of her trial, is also unreliable."

[11]While acknowledging that it was likely that some of the abuse described by the defendant occurred, the judge categorically found that the defendant did not suffer from effects of the abuse, and so rejected the defendant's claim that she was incapable of disclosing the abuse due to battered woman syndrome. On appeal, the defendant argues that the judge's determination was legally erroneous, because it did not include a finding that the defendant's failure to disclose was a free and voluntary act. In refocusing her argument, however, the defendant cannot avoid the judge's clear disbelief of her testimony. Had the judge found that the defendant suffered from battered woman syndrome, or credited the defendant's account of Loring's continued coercion while awaiting trial, but nevertheless found that she was capable of disclosing the abuse to her counsel before her trial (as would have been permissible, see *Commonwealth* v. *Crawford*, 429 Mass. 60, 67 & n.14 [1999]), consideration by the judge of the proper standard of proof necessary

were to be fully believed, would cast real doubt on the justice of her conviction. See *Commonwealth* v. *Figueroa*, 422 Mass. 72, 79 (1996).[12] Although she did not preside at trial, the judge's decision was based on observations during four days of testimony at the evidentiary hearing (including one and one-half days of the defendant's testimony), as well as an undoubtedly thorough consideration of the entire trial record. The defendant's insistence that her admitted perjury, numerous other acts of deception, and her abandonment of attempts to communicate the abuse, were involuntary acts that were attributable to the effects of battered woman syndrome (or to Loring's coercion), carries no weight in light of the judge's implicit rejection of that alternative explanation. There is no basis to conclude that the judge was plainly wrong in her disbelief of the defendant's testimony.[13]

---

to support a motion for a new trial based on newly discovered evidence of abuse might have been warranted.

[12]The judge's subsequent finding that the defendant's testimony of Loring's abuse was merely cumulative is somewhat illogical. Clearly, evidence of abuse of the type the defendant recounted at the evidentiary hearing is a far cry from her trial testimony that she took orders from Loring, allowed Loring to control their money, and was afraid that Loring would leave her. The judge's use of the word "cumulative" may, however, reflect only her disbelief of the defendant's new version of exculpation, and could be interpreted to mean that so much of the defendant's testimony as was credible in the judge's view did not create a substantial risk that the jury, had they heard it, would have reached a different result. We place no reliance on the finding.

[13]The decision of *McMaugh* v. *State*, 612 A.2d 725 (R.I. 1992), relied on by the defendant, does not help her position. In that case, a trial judge had denied a defendant's motion for a new trial based on "newly discovered" evidence that the defendant was a battered woman, noting that the defendant had exhibited many instances of assertiveness that negated her claim that she was unable to assist in her defense, and so rejected the evidence of abuse on the basis that it was not "newly discovered." See *id.* at 730. The Supreme Court of Rhode Island reversed the ruling, concluding that the judge had ignored uncontroverted evidence from medical experts, the defendant's trial lawyers, and the defendant's family and friends that the defendant had endured years of abuse that culminated in a "focused and violent campaign of terror" that deprived her of the ability to assist her trial counsel adequately in preparation of her own defense. See *id.* at 733. See also *United States* v. *Brown*, 891 F. Supp. 1501, 1509-1510 (D. Kan. 1995). Such evidence is not present here. The defendant's whole case hinges on the truthfulness of her testimony. As the Supreme Court of Rhode Island pointed out: "[A] defendant's assertion of the condition [of battered woman syndrome should] be exposed to the most exacting scrutiny to determine its legitimacy in each factual circumstance in which it is presented." *McMaugh* v. *State, supra.*

In summary, we have a judge exercising the most basic attribute of the judicial office, that of assessing the credibility of a defendant who has been convicted and seeks to assert newly discovered evidence. The judge saw the defendant and gauged her truthfulness, which, as we have pointed out, the judge found utterly lacking based on a number of factors, not the least of which was the defendant's admission to committing perjury at her trial. An appellate court should not substitute its judgment in a case like this, when the judge's conclusions are supported and explained. The judge's reasoned rejection of the defendant's testimony, that her failure to reveal the abuse was involuntary due to Loring's conduct and the effects of battered woman syndrome, negates the central premise on which her motion was based. See *United States* v. *Rouse,* 168 F.3d 1371, 1375 (D.C. Cir. 1999).

Finally, the defendant claims that the judge erred in denying her motion for reconsideration and motion to expand the record. With these motions, the defendant presented five additional affidavits from correction officers employed by the Franklin County house of correction during the defendant's stay there, which, according to the defendant, directly contradict the judge's findings that the defendant's account of Loring's continuing control while awaiting trial was "implausible" and had "no corroboration." There is no error in the judge's denial of the defendant's motions.

The judge reasonably may have considered that the affidavits were not new, because the witnesses were not clearly unavailable when the motion was heard.[14] See Mass. R. Crim. P. 30 (c) (2), 378 Mass. 900 (1979). More likely, the judge reasonably may have decided that the affidavits added nothing of substance to the defendant's case, and, as such, did not require another evidentiary hearing. See *Commonwealth* v. *Downs,* 31 Mass. App. Ct. 467, 470 (1991). While the affidavits indicate that the defendant and Loring communicated with each other before the defendant's trial, there is nothing in them in the nature of admissible evidence that shows, with any measure of probability, that

---

[14]The defendant argues that the affidavits were newly discovered because the correction officers came forward only after reading a newspaper account of the denial of the defendant's motion for a new trial, and at considerable professional risk, having had been informed by the sheriff of Franklin County that job repercussions might flow from their signing affidavits. The affidavits themselves are silent on these matters.

the abusive relationship claimed by the defendant happened while the two were incarcerated. Furthermore, contrary to the defendant's assertion, the judge's denial of the motion for a new trial was based on the rejection of her credibility and was not dependent solely on the judge's skepticism of the defendant's account of Loring's conduct toward her while she was awaiting trial. The judge's essential finding was that the defendant, even if she had been subjected to some of the abuse she described, did not suffer from the effects of battered woman syndrome, so that she "had a present awareness of being abused, was cognizant that evidence of that abuse might aid[] her defense and made a decision not to pursue that defense."

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*