COMMONWEALTH *vs.* DARRIEN GOETZENDANNER.

No. 93-P-1295.

Berkshire. January 16, 1997. - May 20, 1997.

Present: WARNER, C.J., KAPLAN, & IRELAND, JJ.

*Battered Woman Syndrome. Evidence,* Expert opinion. *Witness,* Expert. *Practice, Criminal,* Assistance of counsel.

At the trial of rape indictments, the judge properly qualified a witness to testify as an expert on the general characteristics of women with battered woman's syndrome, where the witness had sufficient education, training, experience and familiarity with the subject and where the subject was beyond the jury's common knowledge. [641-643]

Expert testimony about battered woman's syndrome was properly admitted, as a matter of common law, at the trial of rape indictments, where the evidence was confined to a description of the behavioral characteristics of typical victims of battering and did not relate to the symptoms exhibited by the victim in the case; where the evidence helped to explain the conduct of the victim; where it did not provide substantive evidence of the defendant's guilt; and where the evidence did not intrude on the jury's province to assess the credibility of the victim. [643-646]

At the trial of indictments, defense counsel's tactical decision not to attempt to impeach the victim with a prior conviction was not demonstrated to be manifestly unreasonable in the circumstances. [646-647]

There was no merit to various claims by a criminal defendant that his trial counsel had rendered ineffective assistance. [647-649]

INDICTMENTS found and returned in the Superior Court Department on March 20, 1992.

The cases were tried before *William W. Simons,* J., and a motion for a new trial was heard by *James P. Dohoney,* J.

*Charles K. Stephenson* for the defendant.

*Anne M. Kendall,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant was convicted by a Superior Court jury of aggravated rape (two indictments), kidnapping, assault and battery with a dangerous weapon (a stick), assault

by means of a dangerous weapon (a knife), and assault and battery.[1] He was sentenced to concurrent terms of from twenty to thirty years on the aggravated rape convictions.[2] He appeals from the convictions and from the denial of his motion for a new trial,[3] contending that: (1) testimony of an expert witness concerning "battered woman's syndrome" was wrongly admitted as evidence at his trial; and (2) he was denied effective assistance by his trial counsel. We affirm the convictions and the denial of the motion.

1. *Facts.* The pertinent facts that the jury could have found are as follows. The defendant, who was then on parole, met the victim in November, 1991, at the Red Cross in Pittsfield. She subsequently moved into the Pittsfield YMCA. The victim had recently relocated to Pittsfield to escape from an abusive relationship with another man.

The defendant and the victim struck up a relationship, and soon the two moved together into a one-room apartment on Dalton Avenue in Pittsfield. Their relationship was a stormy one. According to the victim, the defendant was jealous and possessive of her, and he occasionally physically abused her. They often argued about another girlfriend of the defendant, who provided him with money and alcohol. On more than one occasion, the victim left the defendant and returned to the battered women's shelter, only to resume the relationship after being swayed by the defendant's emotional entreaties to her that he was sorry and that he loved her. At one point, the victim moved back into the one-room apartment with the defendant, but within a week she returned to the shelter. The victim was drinking and using drugs regularly at the time.

The victim testified that she wished to end the relationship. Despite this, the two met frequently throughout most of February and early March, 1992, while the victim continued to reside at the shelter. During one conversation, the victim arranged with the defendant to pick up some of her belongings

---

[1]At the close of the Commonwealth's case-in-chief, the trial judge allowed the defendant's motions for required findings of not guilty on separate indictments charging him with threatening to murder the victim and with intimidation of a witness.

[2]The defendant also received concurrent terms of imprisonment on the other convictions, except for the one for assault and battery, which was placed on file with his consent.

[3]The trial judge retired before the hearing on the motion for a new trial. Another judge conducted an evidentiary hearing on the motion.

from the Dalton Avenue room where the defendant continued to live.

She went there around noon on March 9, 1992, and found the defendant there alone. At the defendant's request, the two engaged in sexual relations, and then both fell asleep on the defendant's bed for about an hour. The victim awoke and began gathering her belongings. Seeing this, the defendant bolted from the bed, pinned the victim against a wall, and started punching her in the face while telling her that she could not leave him. He pushed her onto the bed and continued to punch her in the face and body.

Later, he ordered her to go to a neighbor's room down the hall to get cigarettes. As she began to neaten herself and to comb her hair, the defendant grabbed her by the hair, tearing a large clump of hair from her scalp. Shortly afterward, the defendant left the room and returned, bearing a stick which he used to beat the victim's head and body until the stick broke into pieces. The defendant resumed beating the victim with his fists and then held a knife to her throat, telling her he could kill her and hide her body in the woods and nobody would ever know.

The defendant ordered the victim to don a pink negligee and to have sex with him. The defendant proceeded to have sexual relations with the victim. Following that act, the two showered together in a communal bathroom down the hall from the room, and the defendant then returned with the victim to the room. Once inside, he barricaded the door with a piece of furniture. The defendant again demanded that the victim have sex with him.

Finally, the defendant left the room, and the victim, clad only in a bathrobe, fled to a neighbors' apartment. One of the neighbors testified that the victim was "crying and shaking and begging for help." The victim told the neighbors of the beating. The victim hid in the neighbors' bedroom while one of the neighbors called the police.

One of the police officers who responded to the neighbor's call described the victim as "ha[ving] been beaten so bad her eyes were practically swollen shut." Shortly afterward, the police officers arrested the defendant as he walked along Dalton Avenue headed back toward the apartment. The victim was taken by ambulance to a nearby hospital where an examining physician observed that she appeared to have been severely beaten.

She was treated and released from the hospital that same night and went back to the shelter. She became distraught, depressed, and obsessed with trying to understand why the defendant had beaten her. She continued to use drugs and to drink heavily. Eventually, she sent the defendant a letter. He wrote back and then continued to write to the victim almost daily, professing his love for her and urging her to assist in his defense by recanting her accusations.

Eventually, the victim went to visit the defendant in jail. She stated that, at the time, she thought that visiting him was a mistake. But she continued to visit him in jail, because she feared that, if she stopped, he would become angry, distraught, and would again try to. hurt her. While he was in jail awaiting trial, the victim visited him and also wrote to him regularly, even sending him a letter (referred to at trial as the "smut" letter) in which she graphically rehearsed the details of their past sexual activities.

Subsequently, the victim had the restraining order against the defendant removed, recanted her earlier statements concerning the attack of March 9, 1992, and attributed the attack to a former boyfriend. Shortly afterward, the victim admitted herself to a residential drug and alcohol treatment program where she reaffirmed to the police her earlier statements about the defendant's role in the March 9, 1992, attack.

2. *Expert testimony about battered woman's syndrome.* To the average juror, untutored in the psychological dynamics of domestic violence, the. victim's vacillating behavior toward the defendant — in particular, her back and forth attempts to end the relationship — might have seemed counterintuitive and might even have suggested that her version of events was inherently unreliable and unworthy of belief. To help blunt the possible impact upon jurors of the victim's erratic conduct and to counter the defendant's cross-examination of the victim concerning that conduct, the Commonwealth (over the defendant's objection) offered expert testimony on the general characteristics of women with battered woman's syndrome (BWS) from Karla Digirolamo, the executive director of the New York State Office for Prevention of Domestic Violence (NYOPDV). Digirolamo holds a bachelor's degree in psychology and, at the time of trial, had over ten years of experience in the field of domestic violence. She had previously testified

as an expert on BWS in two New York State criminal cases. During a voir dire examination, Digirolamo outlined her qualifications in detail.[4]

Digirolamo testified about domestic violence generally and about BWS specifically, which she described as a form of posttraumatic stress disorder. She explained the cyclical nature of abusive relationships, the effect drugs and alcohol have upon those relationships, and the survival tactics typically exhibited by battered women, including their tendency to leave and then return to the batterer many times before finally ending the relationship. According to Digirolamo, women victims of battering often experience a strong desire to understand why the abuse occurred.

Digirolamo never examined the victim and, in fact, never met with or talked to her. Digirolamo did not attempt to "diagnose" the victim as suffering from BWS. She testified exclusively in general terms about typical BWS victims. With but one exception,[5] her testimony focused upon victims of abuse and not upon the perpetrators of abuse.

The defendant contends that the judge should not have qualified Digirolamo to offer expert testimony on BWS because she lacked an advanced, specialized degree as a clinician who could diagnose individuals as suffering from BWS. The defendant complains, too, that, because Digirolamo was "unschooled on the facts of the case," she should not have been permitted to testify as an expert. Finally, the defendant argues that expert testimony on BWS was unnecessary to the Commonwealth's case because the victim herself was capable of explaining the reasons for her own behavior. Whatever as-

---

[4]Beginning in 1981, she worked as a VISTA volunteer in the New York Governor's Task Force on Domestic Violence. She was later hired as project director for the task force, which then became known as the Governor's Commission against Domestic Violence and, eventually, the NYOPDV. Digirolamo sat on the Governor's cabinet by virtue of her position as executive director of NYOPDV.

Digirolamo and her staff were responsible for educating the general public and the professional community about the dynamics of domestic violence. She had trained educators as well as law enforcement, health care, mental health care, and human service professionals throughout the State of New York. She wrote many of NYOPDV's publications and developed many of its programs on domestic violence.

[5]At one point, Digirolamo testified that a batterer acts out of a "belief in his right to control his partner."

sistance Digirolamo's testimony may have provided to the jury, according to the defendant, was far outweighed by unfair prejudice.

"A judge has wide discretion in qualifying a witness to offer expert opinion. *Commonwealth* v. *Devlin,* 365 Mass. 149, 152 (1974)." *Commonwealth* v. *Avellar,* 416 Mass. 409, 417 (1993). See *Commonwealth* v. *Johnson,* 410 Mass. 199, 202 (1991). The decision to qualify a witness as an expert on a particular matter that is within that witness's field of expertise will not be disturbed absent an abuse of discretion or error of law. *Ibid.* "The crucial issue is whether the witness has sufficient education, training, experience, and familiarity with the subject matter of [her] testimony." *Letch* v. *Daniels,* 401 Mass. 65, 68 (1987).

The witness did not have to be a trained clinician, capable of diagnosing particular cases of BWS, in order for the judge properly to qualify her as an expert concerning the general or typical characteristics of BWS. The witness's credentials, which included extensive experience in training and educating other professionals on BWS, see *supra* note 4, adequately qualified her to testify about the particular psychological dynamics of domestic abuse and BWS. The judge did not abuse his discretion in qualifying Digirolamo to testify as an expert on the general characteristics of BWS. See, e.g., *State* v. *Borrelli,* 227 Conn. 153, 166 & n.12, 167 (1993) (witness, who did not have degrees in psychiatry or psychology, qualified as expert to testify on general characteristics of BWS on basis of "extensive educational background, work experience, and research.")

We conclude, as have courts in other jurisdictions, that the pattern of behavioral and emotional characteristics common to the victims of battering lies beyond the ken of the ordinary juror and may properly be the subject of expert testimony. See, e.g., *Smith* v. *State,* 247 Ga. 612, 619 (1981); *State* v. *Kelly,* 97 N.J. 178, 206 (1984); and *People* v. *Torres,* 128 Misc. 2d 129, 134-135 (N.Y. Crim. Ct. 1985). Cf. *Commonwealth* v. *Mamay,* 407 Mass. 412, 421 (1990) (rape trauma syndrome is "beyond the jury's common knowledge" and, thus, expert testimony concerning that syndrome was properly admitted to help explain why a victim would return to a situation where she had previously been raped by the defendant); *Commonwealth* v. *Day,* 409 Mass. 719, 724 (1991)

(expert testimony about battered child syndrome appropriate because condition is not a matter of common knowledge). Testimony concerning BWS could assist jurors in overcoming the common myth or stereotype that the victims of assaultive partners or spouses would naturally choose to end the relationship. See *State* v. *Kelly, supra* at 205-206, and *State* v. *Ciskie,* 110 Wash. 2d 263, 275 (1988).

By statute, expert testimony concerning BWS is now available in the Commonwealth to a defendant charged with murder, manslaughter, or assault of a partner or spouse, where the defendant has claimed self-defense, duress, or coercion. The testimony may be used to establish "the reasonableness of the defendant's apprehension that death or serious bodily injury was imminent. . . ." G. L. c. 233, § 23E(1), as inserted by St. 1993, c. 477, § 1.[6] Section 2 of St. 1993, c. 477, reprinted below in the margin,[7] makes clear the Legislature's intent that § 1 not preempt the offering of expert testimony on BWS in other contexts: for example, where the evidence is offered to rehabilitate a victim witness or to shed light upon a victim's condition. The law of evidence in the Commonwealth remains uncodified and continues to evolve through judicial pronouncement as well as legislative enactment. Our courts enjoy a long tradition of developing common law principles regarding the admissibility of particular evidence. See generally Liacos, Massachusetts Evidence at § 1.1 (6th ed 1994). Hence, the question is whether expert testimony about BWS may be admitted in situations other than those that are expressly authorized by statute.

Our appellate courts have not yet passed upon the precise question whether evidence of BWS may be admitted on behalf

---

[6]Section 1(*b*) of St. 1993, c. 477, provides that, in such cases, the defendant may offer:

> "evidence by expert testimony regarding the common pattern in abusive relationships; the nature and effects of physical, sexual or psychological abuse and typical responses thereto, . . . and evidence whether the defendant displayed characteristics common to victims of abuse."

See *Commonwealth* v. *Rodriguez,* 418 Mass. 1, 7 (1994).

[7]"Nothing herein shall be interpreted to preclude the introduction of evidence or expert testimony as described in subsection (a) and (b) above in any civil or criminal action where such evidence or expert testimony is otherwise now admissible."

of a victim or of a witness who is not the defendant. In analogous contexts, however, our courts have allowed expert testimony concerning scientifically recognized psychological patterns or syndromes akin to BWS to help explain why a victim or a witness may have acted in a particular way. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 627-630 (1989) ("general behavioral characteristics of sexually abused children"); *Commonwealth* v. *Mamay*, 407 Mass. at 421-422 (rape trauma syndrome); *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 175-176 (1983) (admission of expert testimony about rape trauma syndrome in civil case).

Such scientific evidence is confined to a description of the general or expected characteristics shared by typical victims of a particular syndrome or condition. The evidence may not relate directly to the symptoms exhibited by an individual victim or victim witness, nor may it include an opinion or diagnosis that that person suffers from the described condition. *Commonwealth* v. *Dockham, supra* at 630; *Commonwealth* v. *Colin C.*, 419 Mass. 54, 60 (1994), citing *Commonwealth* v. *Mamay, supra* at 421, and *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 759 (1995). Expert testimony may not be admitted to profile or describe the typical attributes of the perpetrators of crimes. *Commonwealth* v. *Day, supra* at 724 (testimony concerning battered child syndrome admissible, but expert testimony concerning typical child batterer is not).

Digirolamo's testimony steered clear of describing the victim or her symptoms or of opining that the victim was an abused woman who appeared to suffer from BWS. Her testimony was confined to describing the behavioral characteristics of typical victims of battering and not of those who batter. Although, on the basis of *Commonwealth* v. *Day, supra* at 724, it was error not to strike from the record the expert's single, fleeting reference to batterers (see note 5), that error does not warrant reversal and a new trial. Aside from that single remark, Digirolamo's testimony was properly admitted as it helped to explain the conduct of the victim, did not provide substantive evidence of the defendant's guilt, and did not "intrude[] on the jury's province to assess the credibility of the witness." *Commonwealth* v. *Trowbridge, supra* at 759.

Courts in other jurisdictions have concluded that expert testimony concerning BWS should be admitted, where rele-

vant, to bolster claims of self-defense or duress.[8] The same evidence has also been allowed in order to help explain the conduct of a victim or a complainant over the course of an abusive relationship. See *Arcoren* v. *United States,* 929 F.2d 1235, 1240-1241 (8th Cir. 1990), cert. denied, 502 U.S. 913 (1991); *State* v. *Borrelli,* 227 Conn. at 168-169; *People* v. *Christel,* 449 Mich. 578 (1995) (evidence of BWS generally admissible to explain a complainant's actions where relevant, although not relevant in the particular facts of the case); *State* v. *Frost,* 242 N.J. Super. 601, 614 (App. Div. 1990); *State* v. *Ellis,* 280 N.J. Super. 533, 543-544 (App. Div. 1995) (reversed because expert testimony not properly limited); *State* v. *Ciskie,* 110 Wash. 2d at 275-276.

Faced, as we are, with the question whether evidence of BWS should be available to a victim who is not a defendant, the court in *State* v. *Frost, supra* at 612 wrote, "It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness . . . and her abuser is the criminal defendant." The Supreme Court for the State of Washington made the same point: "Neither logic nor law requires us to deny victims an opportunity to explain to a jury, through a qualified expert, the reasons for conduct that would otherwise be beyond the average juror's understanding." *State* v. *Ciskie, supra* at 265. To that we simply add that the over-all ends of justice and crime prevention would be ill-served if we were to deny the use of evidence of BWS to a victim seeking redress through the legal system for her injuries, only to allow that same evidence after she finally has taken matters into her own hands

[8]See, e.g., *People* v. *Aris,* 215 Cal. App. 3d 1178, 1193-1199 (1989); *Hawthorne* v. *State,* 408 So. 2d 801, 806-807 (Fla. Dist. Ct. App. 1982); *State* v. *Anaya,* 438 A.2d 892, 894 (Me. 1981); *People* v. *Wilson,* 194 Mich. App. 599, 604 (Mich. Ct. App. 1992); *Bechtel* v. *State,* 840 P.2d 1, 6-8 (Okla. Crim. App. 1992); *Commonwealth* v. *Stonehouse,* 521 Pa. 41, 61-66 (1989); *State* v. *Wilkins,* 305 S.C. 272, 276 (Ct. App. 1991); *Fielder* v. *State,* 756 S.W. 2d 309, 318-321 (Tex. Crim. App. 1988); *State* v. *Allery,* 101 Wash. 2d 591, 597 (1984). See also *United States* v. *Marenghi,* 893 F. Supp. 85, 91-97 (D. Me. 1995) (duress defense to drug charges); and *State* v. *Baker,* 120 N.H. 773, 775-776 (1980) (evidence of BWS offered as rebuttal to defendant's insanity defense in prosecution for attempted murder of his wife).

and is then placed on trial for killing or assaulting her abuser. We conclude that, where relevant, evidence of BWS may be admitted through a qualified expert to enlighten jurors about behavioral or emotional characteristics common to most victims of battering and to show that an individual victim or victim witness has exhibited similar characteristics. The expert's testimony was properly admitted.

3. *Ineffective assistance of counsel.* The defendant claims that his trial counsel was ineffective by failing to: (1) impeach the victim with evidence of a prior felony conviction, (2) pursue certain pretrial motions, and (3) object to portions of the victim's testimony. None of these purported omissions, nor any additional conduct about which he complains, amounts to "serious incompetency . . . falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In any event, the omissions certainly did not "deprive[] the defendant of an otherwise available, substantial ground of defence." *Ibid.*

The defendant's trial counsel elected not to seek admission of the victim's prior felony conviction for unnatural sexual acts in violation of G. L. c. 272, § 35. Relying on *Commonwealth* v. *Dwyer*, 22 Mass. App. Ct. 724, 728 (1986), the defendant argues that, if the record of that conviction had been offered at trial to impeach the victim, the judge would have been obligated either to admit it or, in fairness to the defendant, to condition its exclusion upon the exclusion of certain prior convictions of the defendant.

At the hearing on the defendant's motion for a new trial that was conducted by new counsel, the defendant's trial counsel, who testified, stated that he had made a tactical decision *not* to impeach the victim with her prior conviction. He stated that the evidence may have precipitated "some sympathy for [her]" amongst jurors and may even have raised speculation that the relationship between the victim (who is white) and the defendant (who is black) was that of prostitute and pimp. Trial counsel, too, was aware that the acts for which the victim had been convicted were quite similar to those she had described as having engaged in with the defendant in her "smut" letter to him which was introduced at trial.

Trial counsel, thus, made a tactical decision *not* to attempt

to use the felony conviction to impeach the victim. In these circumstances, that decision was not "manifestly unreasonable," *Commonwealth* v. *Moffett*, 383 Mass. 201, 214 (1981), and, so, cannot form the basis for an ineffective assistance claim. Moreover, even if the conviction had been offered, the trial judge could have exercised his discretion to exclude it, reasoning that a conviction for unnatural sexual acts by the victim had little relevance either to her capacity for truthfulness or to the issue of her consent to sexual relations. See, e.g., *Commonwealth* v. *Domaingue*, 397 Mass. 693, 699 (1986).

The defendant's remaining arguments in support of the ineffective assistance claim lack merit and require only scant discussion. The various pretrial motions[9] that were not pursued by trial counsel would have likely either been denied outright or, if allowed, would have yielded the defendant little of substance.

The motion for dismissal of the indictments because of claimed flaws in the grand jury proceedings would have been denied. The defendant did not support that motion with evidence that the grand jury proceedings were impaired or poisoned in any substantial way because of the police officer's brief exchange with a grand juror.[10] Further, even if the defendant's motion to sever had been allowed and the indictment for intimidating a witness (the victim)[11] had been tried separately, the Commonwealth still could have presented substantially the same evidence of the alleged intimidation — the defendant's repeated entreaties to the victim to recant —

[9]Including a motion for dismissal of the indictments based on alleged improprieties in the grand jury proceedings, a motion for severance of the intimidation of a witness indictment from the other indictments, and motions for pretrial discovery.

[10]The exchange is as follows:

GRAND JUROR: "Is he [the defendant] still in jail?"

POLICE OFFICER WITNESS: "Yes."

GRAND JUROR: "I hope he's in with real big guys."

DISTRICT ATTORNEY (to the police officer): "Do you know what he looks like? How big he is?"

[11]The motion to dismiss the indictment on this charge was granted. See note 1, *supra.*

in order to explain to the jury the victim's inconsistent conduct toward the defendant and to show the defendant's consciousness of guilt. As to the unpursued discovery motions, the judge who denied the defendant's motion for a new trial, correctly concluded that the defendant obtained from the Commonwealth all, or virtually all, of the information he originally sought in those motions.

The defendant also complains of trial counsel's decision not to object to certain testimony from the victim. The defendant suffered little or no prejudice because of his trial counsel's failure to object to the victim's far-ranging testimony covering such topics as her past abusive relationship with another male, counseling and shelter services she was furnished by the Commonwealth in connection with her complaints against the defendant, and details about her initial contact with the defendant when he stole $120 from her purse after first having had sexual intercourse with her. All of the evidence was relevant to explain her inconsistent conduct prior to and subsequent to the criminal episode, to explain her state of mind, or to show that she likely did not consent to having sexual intercourse with the defendant at the times in question. See *Commonwealth* v. *Cordle,* 404 Mass. 733, 744 (1989) (jury is entitled to consider "the entire relationship between the victim and the defendant").

The defendant also complains that it was his trial counsel, in cross-examining a police officer at trial, who elicited testimony that the defendant was on parole on March 9, 1992. At the hearing on the motion for a new trial, trial counsel testified that the decision was a tactical one. After noting that the cross-examination of the victim was "particularly effective," the motion judge categorized the reference to the parole officer as "a slip by a fallible lawyer." If not a justifiable tactical decision — which it may have been in conjunction with an effort to explain the tardiness of the reporting of the rapes and to suggest that the charges were fostered by a parole officer — the passing reference to the parole officer was, at most, a minor slip. The additional complaints that the defendant lodges against his trial counsel are similarly insubstantial.

The defendant has pressed additional claims of error in a

supplemental brief that he submitted on his own behalf. Those claims lack merit and do not warrant reversal or a new trial.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*