## Commonwealth *vs.* Frederick Morris.

No. 10-P-2175.

Essex. February 10, 2012. - September 14, 2012.

Present: MILLS, MEADE, & RUBIN, JJ.

*Rape. Assault by Means of a Dangerous Weapon. Witness,* Expert. *Evidence,* Expert opinion, First complaint, Prior misconduct.

At the trial of indictments charging aggravated rape and assault by means of a dangerous weapon, the judge properly qualified a police officer to offer expert testimony on domestic violence [430-431] and did not abuse his discretion in finding that domestic violence was a proper subject for expert testimony [431-433]; further, the mere fact that the expert's testimony, which was appropriately generalized, was consistent with that of the victim did not render it impermissible vouching for the victim or impermissible profiling of perpetrators of abuse [433-436]; finally, the judge's instructions to the jury on their use of the testimony were appropriate and timely [436-437].

At the trial of indictments charging, inter alia, aggravated rape, no substantial risk of a miscarriage of justice arose from the admission of multiple first complaint testimony, where, with respect to the victim's complaints to one witness, the defendant's conviction of the lesser-included offense of rape supported a conclusion that the testimony of that witness inured to the defendant's benefit, and it was reasonable to infer that defense counsel's failure to object to the testimony was a tactical decision [437-440]; and where other contested testimony (i.e., the victim's complaint to the police) was elicited by the prosecutor at the request of the defense [440].

At the trial of indictments charging aggravated rape and assault by means of a dangerous weapon, the admission of evidence consisting of acts showing the defendant's treatment of the victim permissibly established the defendant's pattern of disrespect and hostility toward her and did not overwhelm the evidence of incidents underlying the charges. [440-442]

INDICTMENTS found and returned in the Superior Court Department on April 3, 2008.

The cases were tried before *Howard J. Whitehead*, J.

*Scott A. Katz* for the defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the Commonwealth.

MILLS, J. The events underlying this case arose in the context of a teenage dating relationship between the complainant, whom we shall refer to as Alice, and the defendant. The defendant was charged with one count of aggravated rape, G. L. c. 265, § 22(*a*), and two counts of assault by means of a dangerous weapon, G. L. c. 265, § 15B(*b*). A jury convicted him of rape as a lesser-included offense of aggravated rape, and one count of assault by means of a dangerous weapon. On appeal, he challenges the admission of three types of evidence: (1) expert testimony on domestic violence, (2) multiple first complaint testimony, and (3) evidence of bad character and prior bad acts. We affirm.

*Background.* We summarize the evidence admitted at trial relevant to the issues before us. Alice met the defendant in April, 2006, during her freshman year of high school, when she was fifteen and he was seventeen. They began dating in July, 2006, and the relationship became sexual. Although dating stopped around May, 2007, they continued to engage in a sexual relationship over the next few months.[1] Alice testified in detail about their relationship and the defendant's behavior, including the two incidents that underlie the charges in this case.

1. *The first incident.* In June, 2007, the parties were no longer dating but regularly engaged in sexual relations when Alice's parents were out of the house. Alice testified that one morning the defendant called and asked to come over and was angry when she refused to see him. While she was brushing her teeth, she heard the garage door open. She stepped out of the bathroom and saw the defendant standing in the hallway pointing a gun at her. She fled to her parents' bedroom, with the defendant following, and begged him not to kill her, to which he replied, "Why shouldn't I? Why shouldn't I kill you now?" When Alice's dog entered the room, the defendant pointed the gun at the dog, and she asked him not to hurt the dog. Thereafter, the defendant calmed down and they had consensual sex.[2] This incident gave rise to the charge of assault by means of a dangerous weapon on which the defendant was convicted.

---

[1] They had completely ceased relations by mid-November, 2007, when Alice contacted the police complaining of misconduct by the defendant.

[2] Alice testified that she still cared for the defendant at this time and continued to see him.

2. *The second incident.* Between late June and mid-July, 2007, the defendant again came over to Alice's house without her permission. She testified that after spending the night on the living room couch, she awoke to find the defendant standing nearby. She asked how he had gotten into the house, and he stated, "I have my ways." At some point, they moved to her bedroom. The defendant had a gun with him, which he placed on the bedside table. He then suggested that they have anal sex. She testified that she refused, but he forced her. Specifically, the defendant picked up the gun from the bedside table. He did not point it at her but picked it up "so that [she] would recognize the fact that it was there." He "kind of held [her] down a little bit . . . us[ing] his weight to kind of keep [her] in place so [she] wouldn't move." When the defendant stopped to get lubrication, she told him, "You know this is rape, right? What did your father teach you? I have rights, you know," to which he replied, "Bitch, you don't have any rights. Get back down there," and continued the act. This event gave rise to the charge of aggravated rape and the conviction of the lesser-included offense of rape. After the incident, Alice continued to see the defendant because she thought she "could be a good force in his life," "did love him still," and was "a little bit intimidated by him."

3. *Ensuing events.* Alice also testified to subsequent bad acts by the defendant, but she continued to see him until at least August, 2007. Then, in October, 2007, she started dating a new person. The next month, the defendant visited her at the supermarket where she worked, asked if she was dating anyone, and called her early the next morning, at 1:00 A.M. She replied by text message, and he responded, also via text message, that he wanted to "[j]ust talk cuz I miss you." Then, on November 14, 2007, the defendant sent her a text message reading, "U f— him yet?"

Alice contacted the police around the date of the final text message. As part of the investigation, Deputy Chief Jeffrey Gillen of the Groveland police department spoke with both Alice and Salem Lahlali, an acquaintance to whom she had complained of the defendant's actions. All three testified as prosecution witnesses. The Commonwealth also called Amesbury

police Detective Robert Wile as an expert on the general characteristics of domestic violence and the behavioral characteristics of victims.

*Discussion.* 1. *Expert testimony.* The defendant first challenges the admission of Detective Wile's testimony on domestic violence. In *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 640 (1997) (*Goetzendanner*), this court explained that, "[t]o the average juror, untutored in the psychological dynamics of domestic violence, the victim's vacillating behavior toward the defendant — in particular, her back and forth attempts to end the relationship — might have seemed counterintuitive and might even have suggested that her version of events was inherently unreliable and unworthy of belief." As in *Goetzendanner*, the Commonwealth here offered expert testimony by Detective Wile on the behavioral characteristics of victims in order to help the jury evaluate Alice's credibility.

Detective Wile heads the domestic violence unit for the Amesbury police department. At the time of his testimony, he had been a police officer for over twenty-one years and had worked solely on domestic violence cases since 1999. Based on his experience and training, he testified about the different types of domestic violence, including verbal, emotional, psychological, and physical abuse. He described the three-phase "cycle of violence," which includes a period of "tension building," a "battering incident," and, finally, a "honeymoon phase." He also testified about "minimization" of abuse, recantation, and the reasons why victims may remain in abusive relationships.[3] Last, he testified about the unique aspects of teenage victims. For the reasons that follow, we conclude that the judge did not abuse his discretion in admitting this testimony.

a. *Expert qualifications.* As a threshold matter, we reject the defendant's contention that the judge erred in qualifying Detective Wile to offer expert testimony. "The decision to qualify a witness as an expert on a particular matter that is within that

---

[3]See generally *Goetzendanner*, 42 Mass. App. Ct. at 641 (expert discussed the "cyclical nature of abusive relationships" and victims' "tendency to leave and then return to the batterer many times before finally ending the relationship"); *People* v. *Brown*, 33 Cal. 4th 892, 897, 906-908 (2004) (expert testimony addressed minimization and recantation).

witness's field of expertise will not be disturbed absent an abuse of discretion or error of law." *Goetzendanner, supra* at 642. See Mass. G. Evid. § 702 (2012). "The crucial issue is whether the witness has sufficient education, training, experience, and familiarity with the subject matter of [his] testimony." *Goetzendanner, supra,* quoting from *Letch* v. *Daniels,* 401 Mass. 65, 68 (1987). The judge reviewed Detective Wile's qualifications during a voir dire examination. Wile was experienced in working with at least 480 victims in the prior year alone, had attended several trainings on domestic violence,[4] and had conducted extensive training of other officers.[5] There was ample evidence to support his qualifications based on his "extensive training, education, and experience in investigating allegations of sexual assault, . . . in particular, in interviewing . . . victims of such assault." *Commonwealth* v. *Richardson,* 423 Mass. 180, 183 (1996). See *id.* at 183 n.4 (police sergeant in sexual assault unit qualified to testify about child sexual assault); *Goetzendanner,* 42 Mass. App. Ct. at 642 (expert qualified based on "extensive experience in training and educating other professionals on BWS [battered woman's syndrome]").

b. *Subject matter.* The defendant next argues that domestic violence is not a proper subject of expert testimony because the testimony is neither helpful to the jury nor reliable. "A trial judge has broad discretion with respect to the admissibility of expert testimony." *Commonwealth* v. *Mamay,* 407 Mass. 412, 421 (1990). In his role as gatekeeper, a judge must determine that expert testimony is both "beyond the common knowledge of jurors" and "reliable." *Commonwealth* v. *Polk,* 462 Mass.

---

[4]During his training, Detective Wile attended three week-long conferences addressing police response to issues of domestic violence and sexual abuse. At least one of the conferences addressed the behavioral patterns of domestic violence victims, as did two additional trainings totaling ten hours.

[5]Through the Amesbury police department, Detective Wile has trained at least thirteen other police departments on domestic violence, including the behavioral characteristics of victims, the cycle of violence, the occurrence of rape and sexual assault, and how to assess the lethality of a situation in the context of domestic violence. He has also worked with the Jeannie Geiger Crisis Center to train judges, district attorney personnel, and others involved with issues of domestic violence. Wile is also a member of the Greater Newburyport Domestic High Risk Team, an affiliation of professionals that gathers members from law enforcement and other organizations, including the Anna Jacques Hospital, to discuss domestic violence cases.

23, 31 (2012), citing *Commonwealth* v. *Barbosa*, 457 Mass. 773, 783 (2010), cert. denied, 131 S. Ct. 2441 (2011). See *Commonwealth* v. *Mamay*, 407 Mass. at 421-422. Here, after careful consideration, the judge found that Wile's testimony would be "beyond [the ken] of at least some average juror." He explained that although significant information about domestic violence has become available to the public in recent years, "not everybody" pursues such knowledge on their own. See *Goetzendanner*, 42 Mass. App. Ct. at 640 (average juror may not understand vacillating behavior of domestic violence victims). The judge further concluded that *Goetzendanner* governed the testimony's admissibility.

We agree that *Goetzendanner* controls. *Goetzendanner*, 42 Mass. App. Ct. at 640-641, held that testimony "about domestic violence generally and about BWS specifically" was admissible to help jurors understand the potentially counterintuitive behavior of victims when assessing a victim's credibility. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 627-630 (1989) (expert testimony on "general behavioral characteristics of sexually abused children" admissible); *Commonwealth* v. *Mamay*, 407 Mass. at 421-422 (rape trauma syndrome); *Commonwealth* v. *Day*, 409 Mass. 719, 724 (1991) (battered child syndrome). Other courts have concluded, in line with *Goetzendanner*, that expert testimony on domestic violence that does not specifically address battered woman's syndrome is admissible. See *People* v. *Brown*, 33 Cal. 4th 892, 895, 906-908 (2004) (expert testimony on "the behavior of victims of domestic violence" covered the "cycle of violence" and counterintuitive characteristics of victim reporting); *Odom* v. *State*, 711 N.E.2d 71 (Ind. Ct. App. 1999) (upholding admission of expert testimony on domestic violence that did not specifically address battered woman's syndrome). As the judge discussed, there is significant literature on the effect of domestic violence on victims' behavior. See *People* v. *Brown*, 33 Cal. 4th at 898-900, and authorities cited. There is also behavioral science support for the value of expert testimony on domestic violence that does not fall neatly into the category of battered woman's syndrome as it is currently defined. See *id.* at 900, 903, citing *People* v. *Humphrey*, 13 Cal. 4th 1073, 1083 n.3 (1996) ("preferred term among many experts today is

'expert testimony on battering and its effects' or 'expert testimony on battered women's experience' "), Bowman, A Matter of Justice: Overcoming Juror Bias in Prosecutions of Batterers Through Expert Witness Testimony of the Common Experiences of Battered Women, 2 So. Cal. Rev. L. & Women's Stud. 219, 226 n.31 (1992), and Dutton, Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome, 21 Hofstra L. Rev. 1191, 1200-1201 (1993). The judge did not abuse his discretion in finding that domestic violence was a proper subject for expert testimony under *Goetzendanner*.

c. *Impermissible vouching and abuser profiling*. We also reject the defendant's contention that Detective Wile impermissibly vouched for Alice's credibility. While an expert may describe the general behavioral characteristics shared by victims of abuse, "[d]eference must be preserved for the role of the jury as the final judge of credibility." *Commonwealth* v. *Federico*, 425 Mass. 844, 848 (1997). Expert testimony must be "confined to a description of the general or expected characteristics shared by typical victims," *Goetzendanner*, 42 Mass. App. Ct. at 644, and "may not relate directly to the symptoms exhibited by an individual victim . . . , nor may it include an opinion or diagnosis that that person suffers from the described condition." *Ibid.* "If that link is avoided, and the testimony does not focus on the specific [victim], the testimony is usually allowed." *Commonwealth* v. *Deloney*, 59 Mass. App. Ct. 47, 55 (2003). The defendant does not allege that Wile explicitly linked his opinion to the actual victim but, rather, that he implicitly invited the jury to make that comparison.

As the court in *Commonwealth* v. *Deloney* explained, "even absent explicit linking of the [expert] opinion to the [victim], the jury may impermissibly be invited to find an identity between the hypothetical subjects of the expert testimony and the specific [victim] . . . ." *Ibid.* In this case, the defendant challenges three aspects of Wile's testimony as implicit vouching: (1) a description of the "cycle of violence,"[6] (2) testimony that vic-

---

[6]See generally *Goetzendanner*, 42 Mass. App. Ct. at 641; *People* v. *Brown*, 33 Cal. 4th at 906-908.

tims often have feelings of "worthless[ness]" and "low self-esteem," and return to abusive relationships because, among other reasons, they "say they're in love,"[7] and (3) the particularization of his testimony to teenage victims. The defendant argues that these statements were consistent with those of the actual teenage victim in this case, implicitly linking the opinion to Alice. Alice testified about acts of abuse followed by periods of calm in the relationship, feelings of low self-worth and low self-esteem, and remaining in the abusive relationship because she loved the defendant.

This court has acknowledged the "apparent oddity that . . . the more numerous the similarities between the individual . . . victim and a 'standard' . . . victim created by an expert witness, the more likely it is that the expert testimony will be excluded." *Commonwealth* v. *Deloney*, 59 Mass. App. Ct. at 56. However, the mere fact that an expert's testimony is consistent with that of the victim does not, alone, render it impermissible vouching. To the contrary, it demonstrates the relevance of the expert opinion as an aid to the jury in understanding a victim's counterintuitive actions. See *ibid.* ("expert testimony that explains to the jury that child abuse victims may behave in ways that to lay persons may seem illogical" is permissible so long as it does not "suggest[] that child victims in a particular case have acted typically when compared to a 'norm' of child victims"). See also *Commonwealth* v. *Colon*, 49 Mass. App. Ct. 289, 291 (2000) ("expert testimony on the . . . general behavioral characteristics of sexually abused children is admissible and does not, of itself, constitute an opinion on the credibility of the complaining witness").

Detective Wile's testimony was appropriately generalized. *Goetzendanner* specifically upheld the allowance of expert testimony about the "cycle" of domestic violence and the underlying emotional state of victims. See 42 Mass. App. Ct. at 641 (expert "explained the cyclical nature of abusive relationships" and that "women victims of battering often experience a strong desire to understand why the abuse occurred"). See also *Commonwealth* v. *Dockham*, 405 Mass. at 628 (expert testified

---

[7]See generally *Commonwealth* v. *Pike*, 431 Mass. 212, 221 (2000); *People* v. *Brown*, 33 Cal. 4th at 897; *Odom* v. *State*, 711 N.E.2d 71 (Ind. Ct. App. 1999).

that "sexually abused children exhibit impaired trust, withdrawal, depression, guilt, shame, anxiety, and hypervigilance"); *People v. Brown*, 33 Cal. 4th at 897, 907 (expert testimony covered the "cycle of violence" and counterintuitive reporting behaviors of victims who "may still love the defendant and hope that things will get better"); *Odom v. State*, 711 N.E.2d at 74 (domestic violence victims may recant allegations based on, among other reasons, "emotional attachment to the perpetrator" and "a desire to mollify the defendant's anger"). See generally *Commonwealth v. Pike*, 431 Mass. 212, 221 (2000), quoting from *Commonwealth v. Moore*, 25 Mass. App. Ct. 63, 66 (1987) (abuse can cause "a decrease in self-esteem, an emotional dependence upon the dominant male and [a] type of psychological 'learned' helplessness"). While the particularization of Detective Wile's testimony to teenage victims may have brought his statements closer to the actual victim in this case, his testimony did not cross over the line into impermissible vouching. He stated only that teenagers look at controlling behaviors "as affection" showing "the person really loves them."[8] Moreover, the teenage victim in this case did not testify that she saw the defendant's abusive behavior as affection. Wile's testimony falls far short of the "vivid portrait" of the actual victim drawn by the expert opinion in *Commonwealth v. Deloney*, 59 Mass. App. Ct. at 58. See *id.* at 57-59 (impermissible vouching where expert offered eight examples that closely matched actual victim, including testimony that child victims often have cognitive limitations or learning disabilities, are told to keep the abuse secret, and receive positive rewards from the abuser). Additionally, Detective Wile had not interviewed Alice, nor did he respond to hypotheticals presenting the facts of the case. Compare *Commonwealth v. Richardson*, 423 Mass. at 186; *Commonwealth v. Rather*, 37 Mass. App. Ct. 140, 148-149 (1994). We conclude that he provided "permissible expert testimony that suggest[ed] to the jury that certain behavior on the part of the victim . . . does not necessarily exculpate the defendant . . . ." *Commonwealth v. Deloney*, 59 Mass. App. Ct. at 57.

Nor did the expert opinion impermissibly profile perpetrators

---

[8]Wile testified, "[Teenagers] look at the push, being told what to do, the jealousy issues that go on, being told how to dress, they look at it as affection, as the person really loves them . . . ."

of abuse. The defendant argues that Wile's testimony about types of abuse echoed Alice's recitation of the events so closely that, in effect, it created a profile of a typical abuser. An expert must not "profile or describe the typical attributes of the perpetrators of crimes." *Goetzendanner*, 42 Mass. App. Ct. at 644. See *Commonwealth* v. *Federico*, 425 Mass. at 850. However, the defendant has not pointed to any statement describing an abuser as opposed to describing typical acts of abuse. Impermissible abuser profile testimony includes, for example, statements that abusers often date single mothers and abuse their children while the mothers are at work, *Commonwealth* v. *Day*, 409 Mass. at 724, or that "a batterer acts out of a 'belief in his right to control his partner.' " *Goetzendanner*, 42 Mass. App. Ct. at 641 n.5. See *id.* at 644.

By contrast, the defendant challenges Wile's statements that (1) psychological abuse includes "throwing things, not directly at [the victim], but in the general area where they are," and "threaten[ing] to hurt themselves," and (2) verbal abuse includes "belittling" and "name-calling."[9] We reiterate that the fact that some of a victim's testimony closely aligns with an expert's description of abuse shows the utility of the expert opinion; it does not necessarily transform the opinion into an abuser profile. Cf. *Commonwealth* v. *Jackson*, 45 Mass. App. Ct. 666, 671 (1998) (permissible for police officer qualified as an expert to offer an "explanation of the modus operandi employed in transacting drug sales" but not a "description of a characteristic of drug buyers").

Finally, the judge gave an appropriate, timely jury instruction

---

[9]It is clear from the transcript that, despite some parallels with Alice's testimony, the expert opinion was not geared toward this defendant. Alice testified that the defendant (1) hit her with a chair, which he "didn't throw" but "pushed . . . over in [her] direction," (2) threatened to kill himself, and (3) mocked her performance on the high school track team and called her vulgar names. Other such acts testified to by the expert, but not seen in Alice's testimony, included "break[ing] things" and "us[ing] past behavior" by saying, "[R]emember what I did before, I'll do it again." Detective Wile also described more familiar acts of physical abuse, such as "hitting, slapping, punching, biting, strangulation, [and] sexual abuse," many of which were not present in this case. Likewise, the expert's full description of "verbal or emotional" abuse included "name-calling, belittling, constantly blaming the victim, [and] threatening to do bodily harm to them" — a variety of abusive behaviors, some found in Alice's testimony, and some not.

on the use of expert testimony. Detective Wile was the final witness, and on the same day, following a recess and closing arguments, the judge charged the jury on how to assess expert testimony, as set out in the margin.[10] "Such limiting instructions safeguarded the jury's proper use of [the] expert testimony." *Commonwealth* v. *Dockham*, 405 Mass. at 629. We perceive no error in the allowance of Detective Wile's expert opinion regarding either the victim or the defendant.

2. *First complaint testimony.* The defendant next argues that the judge erroneously allowed "piling on" of first complaint testimony. He challenges testimony by Alice, by Salem Lahlali, and by Deputy Chief Gillen as violating the first complaint doctrine. The doctrine limits testimony about a victim's complaints of sexual assault to a single witness, generally the first person told. See *Commonwealth* v. *King*, 445 Mass. 217, 243 (2005), cert. denied, 546 U.S. 1216 (2006) (first complaint is most pertinent to jury's assessment of victim's motivation for coming forward and credibility); *Commonwealth* v. *McCoy*, 456 Mass. 838, 844-845 (2010).

a. *Standard of review.* The defendant did not object to any of the complaint testimony at trial, and we therefore review for a substantial risk of a miscarriage of justice. *Id.* at 846. "A

---

[10]The judge instructed jurors that they were "the sole, the exclusive judges of the facts." Regarding witness testimony, he said, "[I]t's your unique function as the judges of the facts to weigh the credibility, the believability of the testimony that you heard." Turning to the testimony of police officers and expert witnesses, he charged:

"Police officers testified in this case. Police officers are just like everybody else when it comes to assessing believability. The only difference is, they have a different job, . . . and you assess their credibility in the same way that you would any other witness.

"One witness, a police officer as it turns out, was allowed to testify as an expert. Now, that doesn't mean that he has any more credibility, or any less than any other witness. What it means is simply this. By reason of his training and experience, he may have knowledge that the average juror wouldn't have, and for that reason, he's allowed to express his opinion on certain subjects.

"Generally, witnesses are not allowed to express their opinion, but an expert witness is.

"But in assessing expert testimony, you use the same factors that you would use in assessing the credibility of any other individual."

substantial risk of a miscarriage of justice exists when we 'have a serious doubt whether the result of the trial might have been different had the error not been made.' " *Id.* at 850, quoting from *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999). "In analyzing a claim under the substantial risk standard, we review the evidence and case as a whole and ask four questions: '(1) Was there error? . . . (2) Was the defendant prejudiced by the error? . . . (3) Considering the error in the context of the entire trial, would it be reasonable to conclude that the error materially influenced the verdict? . . . [and] (4) May we infer from the record that counsel's failure to object or raise a claim of error at an earlier date was not a reasonable tactical decision?' " *Commonwealth* v. *McCoy*, *supra*, quoting from *Commonwealth* v. *Randolph*, 438 Mass. 290, 298 (2002). We grant relief under this standard only if all four questions are answered in the affirmative. *Commonwealth* v. *McCoy*, *supra*, citing *Commonwealth* v. *Randolph*, *supra* at 297-298.

b. *Complaint witnesses.* At trial, Alice testified about two separate instances of abuse underlying the charges on which the defendant was convicted — an initial incident when the defendant threatened her and her dog with a gun (for which the defendant was convicted of assault by means of a dangerous weapon), and a second incident when he anally raped her (for which the defendant was charged with aggravated rape, and was convicted of the lesser-included offense of rape). The Commonwealth called Salem Lahlali, an acquaintance of Alice's, as the designated first complaint witness. Lahlali testified about a single telephone conversation with Alice in late July. He recounted that she called him crying and told him that the defendant "had a gun up to her and raped her," and "gun . . . slapped her dog." The defendant argues that Lahlali's testimony echoed Alice's description of the first incident and thus does not implicate a sexual assault at all, taking it out of the first complaint rubric and rendering the testimony inadmissible.

A full reading of Lahlali's testimony shows, however, that he was not explicit about whether his understanding was that the acts he described, as recounted to him by Alice in their July conversation, were all part of a single incident.[11] To the extent

---

[11]Lahlali recounted the following statements by Alice: "Pretty much that

that his testimony differed from that of Alice, it was for the defense to exploit any inconsistencies. Defense counsel did so vigorously in his closing, arguing that the discrepancies between Alice's and Lahlali's testimony showed either that Alice had lied to Lahlali (due to a romantic interest) or that Lahlali was now lying on her behalf.

Turning to Alice's testimony, the defendant contends that she impermissibly testified about multiple complaints to Lahlali, as well as complaints to the police. First complaint testimony is limited to the initial complaint. See *Commonwealth* v. *Arana*, 453 Mass. 214, 222-223 (2009) ("where a complainant makes successive complaints to the first complaint witness, the initial complaint is the only evidence admissible as first complaint"). During her direct examination, Alice testified, "I did definitely tell him about the first incident, and then I do believe I told him — I don't know if it was the same exact time that I saw him, but I do remember I ended up telling him about the times that [the defendant] forced me to have anal sex with him." It was only on cross-examination that she clearly said she discussed with Lahlali the defendant's actions "[a]t least twice," and "definitely more than once." To the extent that repetition of the complaint to Lahlali bolstered her credibility, any error was compounded by the defendant. More importantly, "we must consider whether defense counsel's failure to object to the testimony could have been a tactical decision." *Commonwealth* v. *McCoy*, 456 Mass. at 852. Defense counsel emphasized Alice's multiple complaints when cross-examining her and relied on inconsistencies between her and Lahlali's complaint testimony in his closing argument.[12] The defendant's conviction of only the lesser-included offense of rape and one count of assault by means of a dangerous weapon supports a conclusion that "the

[the defendant] had a gun up to her and raped her." "That he gun . . . slapped her — gun . . . slapped her dog, and then held it to her while she was in the corner." "She said that he held a gun up to her, and the only way to calm him down was pretty much to have sex." "That he held up a gun to her and pretty much forced her to rape her." Finally, Lahlali responded affirmatively to the Commonwealth's question whether the defendant "used a gun to force her to have sex?"

[12]For example, defense counsel pointed to inconsistencies about whether Alice and Lahlali spoke in person or on the phone, whether Alice said the defendant pointed the gun at the dog or hit the dog, and whether there was anal rape.

testimony of the witness[] inured to the defendant's benefit, [and] it is reasonable to infer that defense counsel's failure to object was a tactical decision." *Id.* at 853.[13]

The defendant also argues error in the admission of Alice's statement that she complained to the police. However, the prosecutor elicited this testimony at the request of the defense. Earlier in the trial, the Commonwealth had addressed a desire to show when the police investigation began. See *Commonwealth* v. *Arana,* 453 Mass. at 226-227 (even where a police officer is not the first complaint witness, testimony concerning the circumstances giving rise to the police involvement in a sexual assault case may be admissible as part of the prosecution's case-in-chief). In order to avoid an inference by the jury that the police independently began investigating the defendant for other conduct, defense counsel requested that the police involvement be introduced through evidence that Alice complained to them. Counsel expressed his preference that Alice testify that she went to the police in November, and indicated that he had no objection to that testimony. Again, the defense made a reasonable strategic choice. See *Commonwealth* v. *McCoy,* 456 Mass. at 852-853. Consequently, Deputy Chief Gillen's statement that he interviewed Alice during his investigation was cumulative and nonprejudicial. The multiple first complaint testimony did not create a substantial risk of a miscarriage of justice.

3. *Bad character and prior bad act evidence.* The defendant argues that the Commonwealth introduced a litany of bad character and bad act evidence with the sole purpose of portraying the defendant negatively. For example, the defendant points to testimony that he called Alice vulgar names and threatened her. "The prosecution, of course, may not introduce evidence of a defendant's prior misconduct to demonstrate bad character or propensity to commit the crime charged." *Commonwealth* v. *DeMarco,* 444 Mass. 678, 681-682 (2005). See Mass. G. Evid. § 404 (2012). However, "[e]vidence of relevant prior misconduct

---

[13]The defendant's final claim, that Alice implicitly conveyed to the jury that she complained to her parents, is unsupported by the record. She stated only that after the rape, she "was feeling bad about [her]self because [she] was keeping it from [her] parents, everything that happened," and that she then unburdened herself to Lahlali, without in any way intimating that she made the allegations to her parents as well.

may be admissible for other purposes, . . . such as to show intent or motive." *Commonwealth* v. *DeMarco, supra* at 682 (allowing evidence of defendant's emotional abuse of victim over years leading up to her murder). In the context of sexual assault, "evidence of uncharged conduct may be admissible to give the jury a view of the entire relationship between the defendant and the alleged victim, and 'the probative existence of the same passion or emotion at the time in issue.' " *Commonwealth* v. *Dwyer*, 448 Mass. 122, 128-129 (2006), quoting from *Commonwealth* v. *Barrett*, 418 Mass. 788, 794 (1994). Cf. *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981) (at murder trial, "[i]t was well for the jury to have a view of the entire relationship between the defendant and . . . the alleged victims"). "These determinations are left to the sound discretion of the judge, . . . whose decision to admit such evidence will be upheld absent clear error." *Commonwealth* v. *DelValle*, 443 Mass. 782, 790 (2005).

As the acts complained of consist almost entirely of acts showing the defendant's poor treatment of Alice, we need make only a few remarks.[14] First, while the defendant argues that evidence that he had sex with Alice when he was seventeen and she was fifteen shows the "bad act" of statutory rape, the Commonwealth never mentioned statutory rape. Nor did the prosecution focus on the defendant's age beyond a cursory mention by Alice of their ages upon meeting and entering into a relationship, which the judge could consider relevant to the dynamics of the relationship. Second, the defendant's status as a high school dropout is the only act that arguably did not provide the jury a view of the parties' "entire relationship" and the defendant's passions or emotions during the rape and assault. Thus, with this one exception, "[t]he challenged testimony, if credible, establishe[d] the defendant's pattern of disrespect and

---

[14]The defendant challenges evidence that he dropped out of high school and discouraged Alice from studying, had sex with Alice when he was seventeen and she was fifteen, called Alice vulgar names, was jealous when she interacted with other boys, pushed a chair over in her direction that wound up hitting her, abandoned her at a track meet and insulted her performance, threatened to kill himself, hated and threatened her parents, let her dog escape and was indifferent to its safety, threatened her if she dated anyone else, "ke[pt] tabs" on her after their breakup, and sent her a text message reading "U f— him yet?"

hostility toward the victim that continued until the day he [raped] her." *Commonwealth* v. *DeMarco*, 444 Mass. at 682. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 433 (2002). The evidence of these acts did not overwhelm the evidence of incidents underlying the charges. Compare *Commonwealth* v. *Dwyer*, 448 Mass. at 128-129 (detailed testimony of seven uncharged incidents of sexual assault overwhelmingly prejudicial).

The defendant argues that the prosecutor improperly encouraged the jury to convict the defendant based on these bad acts. As he failed to object to both the bad act evidence[15] and the Commonwealth's closing argument, we review for a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). The Commonwealth may refer in its closing to bad act evidence that was properly admitted. *Commonwealth* v. *Delong*, 60 Mass. App. Ct. 122, 133 (2003). Here, the only improperly admitted evidence was that of the defendant's status as a high school dropout. We cannot conclude, in view of all of the evidence before the jury, that the Commonwealth's reference to the defendant's high school status on direct examination and in its closing created a substantial risk of a miscarriage of justice.[16]

*Judgments affirmed.*

---

[15]We note that although the judge failed to give a limiting instruction on the use of evidence of bad character or prior bad acts, the defendant did not request such an instruction. "[S]ince there was no request for a limiting instruction, the judge's failure to give such an instruction was not error." *Commonwealth* v. *Errington*, 390 Mass. 875, 882 (1984).

[16]With respect to the defendant's other claimed errors in the Commonwealth's closing, the prosecutor's argument that Alice had no motive to lie was properly grounded in the evidence at trial. It rebutted the defense argument that Alice had fabricated the charges, *Commonwealth* v. *Helberg*, 73 Mass. App. Ct. 175, 179-180 (2008), and did not suggest that the prosecutor had outside knowledge that Alice was telling the truth. *Commonwealth* v. *Felder*, 455 Mass. 359, 368 (2009). Nor did the prosecutor improperly seek to inflame the jurors' passions by reference to the specific evidence of the defendant's abuse of Alice or by stating that Alice learned from the defendant "how to be emotionally and physically abused." Compare *Commonwealth* v. *Baran*, 74 Mass. App. Ct. 256, 283 (2009) ("I beseech you — I beg you — think of those children . . ."); *Commonwealth* v. *Grinkley*, 75 Mass. App. Ct. 798, 808-811 (2009) (urging the jury to "think about what it must have been like" for the victims, particularly during their rape examination).